**Deeadra Kay HALL, Plaintiff,**

v.

**Gregg HEBRANK, et al., Defendants.**

No. C–3C95–430.

United States District Court,
S.D. Ohio,
Western Division.

Jan. 19, 1999.

Lawrence William Henke, III, Harold R. Farquar, Dayton, OH, for Plaintiff.

Lawrence Joseph Greger, Greger and Ovington, Dayton, OH, Patricia A. Wise, Renisa A. Dorner, Wise & Dorner, Ltd., Toledo, OH, for Defendants.

**DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. # 85), INSOFAR AS IT IS DIRECTED TOWARD THE TITLE VII SEXUAL HARASSMENT CLAIM IN COUNT IV OF THE PLAINTIFF'S COMPLAINT (DOC. # 20); THE PLAINTIFF'S TITLE VII DISPARATE TREATMENT SEXUAL DISCRIMINATION CLAIM (COUNT III) IS DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION; TO THE EXTENT THAT THE PLAINTIFF'S COMPLAINT (DOC. # 20) MAY BE CONSTRUED AS STATING A TITLE VII CLAIM OF CONSTRUCTIVE DISCHARGE BASED UPON UNLAWFUL RETALIATION, SAID CLAIM IS DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION; THE STATE–LAW CLAIMS CONTAINED IN COUNTS I, II, AND IV OF THE PLAINTIFF'S COMPLAINT (DOC. # 20) ARE DISMISSED WITHOUT PREJUDICE TO REFILING IN A STATE COURT OF COMPETENT JURISDICTION; DEFENDANTS' MOTION TO STRIKE EVIDENTIARY MATERIALS (DOC. # 93) OVERRULED AS MOOT; JUDGMENT TO ENTER IN FAVOR OF THE DEFENDANTS AND AGAINST THE PLAINTIFF; TERMINATION ENTRY.**

RICE, Chief Judge.

This matter comes before the Court upon a Motion for Summary Judgment

(Doc. # 85) and a Motion to Strike Evidentiary Materials (Doc. # 93), filed by Defendants Mid Am, Inc., AmeriFirst Bank, and Gregg Hebrank. The Defendants seek summary judgment on the various Title VII and state law claims raised in the Plaintiff's Complaint (Doc. # 20). They also seek to strike certain evidentiary materials attached to the Plaintiff's Memorandum in Opposition to Summary Judgment. (Doc. # 88).

The Plaintiff's claims arise from her employment with AmeriFirst Bank. Her four-count Complaint alleges: negligent and/or intentional touching under Ohio law (Count I); negligent hiring, retention, and entrustment under Ohio law (Count II); negligent and/or intentional infliction of emotional distress under Ohio law (Count II); gender discrimination in violation of Title VII (Count III); and sexual harassment in violation of Title VII and Ohio Rev.Code § 4112.99 (Count IV).[1]

## I. *Factual and Procedural Background*[2]

Deeadra Hall is a former employee of the AmeriFirst Bank ("AmeriFirst"). Hall initially worked as a teller and a receptionist for the bank. She later worked in AmeriFirst's marketing department from October, 1994, until her resignation in early December, 1994. Hall's supervisor in the marketing department was Gregg Hebrank, a vice-president of the bank. (Southwick depo. at 52). Although Hebrank did not have the ultimate authority to hire Hall, he conducted her interview for the marketing position. (Hall depo. at 38).

During her employment in the marketing department, Hall had a number of experiences with Hebrank that she considered to be sexual harassment. Hebrank's first objectionable act took place in her interview, when he asked whether she planned to have children. (*Id.* at 38). Shortly thereafter, another incident occurred when Hall spoke with Hebrank in his office. As Hall sat in a chair along the office wall, Hebrank would not look at her face, focusing instead on the lower half of her body, her skirt, and her legs. (*Id.* at 39).

Thereafter, Hebrank began engaging in what Hall considered offensive "touchings." (*Id.* at 40). The touchings began the first time Hall and Hebrank drove to a company meeting together in Hebrank's company car. (*Id.*). On that first occasion, Hebrank reached over and briefly touched Hall's leg just above the knee. (*Id.* at 42). Hall thought Hebrank's conduct was unusual, but she let the incident pass without comment. (*Id.* at 43). Subsequent "touchings" were similar to the first incident, but Hebrank began placing his hand flatter on Hall's leg and leaving his hand there longer. (*Id.*). Hall described the contact as light squeezing and rubbing right above her knee, near the thigh. (*Id.* at 44). Hall traveled with Hebrank to meetings two or three times per week, and these touchings occurred every time, except on rare occasions when a third-party was present. (*Id.* at 41, 44–45). Near the end of Hall's employment in the marketing department, Hebrank's actions became more "severe" and "bold." He began touching Hebrank's leg and proceeding less than one inch under the hem of her skirt with his fingertips. (*Id.* at 45–46). In response to Hebrank's conduct, Hall "tensed up" and "tried to scoot over." (*Id.* at 46). She also began wearing pantsuits or throwing a long winter coat over her legs. (*Id.*). She tried to drive her

1. Before addressing the merits of the Defendants' Motion for Summary Judgment, the Court notes that it has thoroughly reviewed the Defendants' Memorandum in Support of Summary Judgment (Doc. # 85), the Plaintiff's Memorandum in Opposition to Summary Judgment (Doc. # 88) and the Defendants' Reply Memorandum. (Doc. # 92).

2. For purposes of the present Motion for Summary Judgment, the Court accepts Hall's factual allegations as true and construes those allegations, and all reasonable inferences drawn therefrom, in a light most favorable to her.

own car to meetings, but Hebrank required her to ride with him in the company car. (*Id.* at 46–47). On one trip together in the car, Hall drove while Hebrank ate a pudding cup without a spoon. He stuck his tongue "all the way down" into the pudding cup and licked it out in a way that Hall found "suggestive and pretty disgusting." (*Id.* at 70). On another trip, while returning from a branch office, Hebrank began loudly singing a song entitled, "I'll Make Love to You." (*Id.* at 28). Hall described the song as "[v]ery sex oriented." (*Id.* at 90).

In addition to the "touchings" and other incidents in the car, Hebrank had physical contact with Hall on two other occasions. The first incident occurred while Hall and Hebrank were preparing to send calendars to the branch offices. As Hebrank worked standing up, Hall moved behind her and pressed his body "hard" against her, while reaching for something, and then moved away. Hall felt Hebrank's groin against her during the contact. (*Id.* at 50). The second incident occurred near the end of Hall's employment in the marketing department. While Hall worked seated at her desk in a low-back chair, Hebrank offered to help her program her telephone. After approaching Hall, he stood behind her and pressed his groin up against her. (*Id.* at 52–53).

Hebrank also engaged in other conduct that Hall found objectionable. In particular, Hall felt "stalked" because Hebrank regularly looked for her at work and had to know where she was every minute. (*Id.* at 56). Hebrank's concern with Hall's whereabouts became a running office joke. (*Id.*). On one occasion, Hebrank interrupted an AmeriFirst computer class that Hall was taking. After opening the door, Hebrank stated, "there you are" and, "I've been looking for you everywhere. I was so worried." (*Id.* at 57). He then added, "I just couldn't find you. It upset me." (*Id.*). On another occasion, Hall exited the restroom, and Hebrank said, "I was wondering where you were." (*Id.*). Many

times, Hebrank also waited for Hall after work to walk outside with her. Hall began trying to avoid the situation by leaving a few minutes early, waiting until he was gone, or using different doors. (*Id.* at 58–59). Hall also became "very worried" after Hebrank once told her that he had driven past her new house the previous evening. (*Id.* at 78).

In addition to the foregoing incidents, Hall found objectionable Hebrank's reference to her as "the looks in the marketing department," when he introduced her to a business associate in the presence of Don Southwick, AmeriFirst's president. (*Id.* at 60). Hall interpreted the comment as "very harassing, very demeaning." She considered it a "power play" rather than a compliment. (*Id.*). According to Hall, Hebrank also generally was very flirtatious, and he visually "wandered up and down a woman's body." (*Id.* at 72). As a result, she began pinning her blouses and suits "to keep him from looking." (*Id.* at 71). The final incident that Hall found objectionable occurred shortly before she reported Hebrank's actions to AmeriFirst's Human Resources Department. On that occasion, Hebrank and Hall were reviewing a photocopied document. Hebrank made only one copy and "sat as close to [Hall] as he could" so she could read the copy. (*Id.* at 76). When Hall suggested making another copy, Hebrank responded, "No, we can only have one." (*Id.*).

Shortly after the incident involving the photocopy, Hall was supposed to go to a meeting with Hebrank in the car, but she found herself unable to do so because she was "tired of the struggle...." (*Id.* at 80). Pete Williams, an AmeriFirst officer, discovered Hall crying in a vacant office. (*Id.* at 80). Without going into details with Williams, Hall told him that she could not stand the situation any longer. (*Id.* at 81). Williams then told Hall that if she did not report the problem to members of the Human Resources Department, he would do so. (*Id.* at 82). An employee named

Shari Bowman also entered the room and attempted to comfort Hall. (*Id.* at 81). According to Hall, Bowman told her "that she and two other employees had tried to make a formal complaint against [Hebrank] but they were told to quit causing trouble." (*Id.* at 82).

The next morning, a Wednesday, Hall arrived early and spoke with Anita Lewis and Linda Bynum. Although Bynum worked in AmeriFirst's Human Resources Department, at that time Lewis did not. (*Id.* at 83, 97; Lewis depo. at 23). Hall never approached anyone at AmeriFirst with a complaint about Hebrank's conduct, until she spoke with Lewis and Bynum. (Hall depo. at 93). After Hall explained her problems with Hebrank, the two women advised her to write him a forceful letter expressing her complaints, and to avoid being alone with him. (*Id.* at 96). Lewis and Bynum told Hall that such a letter should "scare" Hebrank and resolve the problem. (*Id.*). Hall wrote Hebrank a letter later that day. She showed it to Bynum, and then gave it to Hebrank as he prepared to leave early for the day. (*Id.* at 97). After receiving the letter, Hebrank became "frantic" and "pale." (*Id.* at 98). He directed Hall to a conference room to talk. (*Id.*). Once inside, Hall and Hebrank engaged in a short conversation. Hebrank told her that he was surprised she had written the letter about him, and that he was upset. (*Id.*). Hebrank also explained that he was a "touchy person," and he apologized for the incident when he made her sit close to him with only one photocopy. (*Id* at 99). Hebrank then told Hall he could reduce her responsibilities if she felt like she could not handle them. (*Id.*). Hall perceived the comment as a tacit threat to take her job away. In response, she ended the conversation by offering to "start over" with Hebrank the following week. (*Id.* at 100). Hall then returned to work and finished her day. (*Id.* at 101).

The following day, a Thursday, Hall commenced a pre-planned vacation from work. She did not report to work Friday either, because it was Veterans' Day, a holiday. Following the weekend, Hall did not work Monday because she had taken it off as part of her planned vacation. (*Id.* at 97, 101). On Tuesday, the day she was scheduled to return to work, Hall called in and took either a sick day or another vacation day, because she still was upset about Hebrank. (*Id.* at 103). After receiving Hall's message about taking the day off, Linda Bynum called her and suggested telling Don Southwick, AmeriFirst's president, about the problem with Hebrank. (*Id.*). Hall agreed that Southwick should be notified. Later that day, Southwick called Hall and asked to speak with her in person. (*Id.* at 104). He arrived shortly thereafter, accompanied by Bynum, and talked to Hall as they drove around town. (*Id.*). After listening to Hall discuss her problems with Hebrank, Southwick told her that he would investigate what needed to be done, and that he would call her back that evening. (*Id.* at 105).

Southwick then immediately contacted the corporate Human Resources Department at Mid Am, Inc., AmeriFirst's parent company. (Southwick depo. at 30). After speaking with David Francisco, the president and CEO of Mid Am, Southwick spoke with Hebrank and placed him on a three-day suspension so that an investigation could take place. (*Id.* at 31). Southwick subsequently called Hall that evening and told her Hebrank would not return to work for the rest of the week. He also offered to let her stay home, with pay, for the remainder of the week. (Hall depo. at 105–106). Hall declined the offer and said that she would return the next day. (*Id.*).

Upon her return, Hall discovered that Southwick and Robin Wooddall, a representative of Mid Am, Inc., had initiated an investigation into her allegations. (*Id.* at 106–107). In an interview with Southwick and Wooddall, Hall recounted her problems with Hebrank, and Wooddall offered to provide counseling, at the company's

expense and during work hours, to help her deal with the situation. (*Id.* at 107–108, 111). Southwick and Wooddall then interviewed several other AmeriFirst employees and prepared a written synopsis of the interviews. They spoke first with Pete Williams, an AmeriFirst assistant vice-president, who recounted finding Hall crying in the dark office, advising her to report the incident to the Human Resources Department, and telling her that he would report the incident if she did not. (Southwick depo. at 38). Southwick then spoke with Anita Lewis and Linda Bynum. He instructed them to report allegations of sexual harassment immediately in the future, rather than telling the complaining employee to write a letter. (*Id.* at 35–37). Southwick and Wooddall next interviewed Hebrank away from the AmeriFirst building. He denied Hall's allegations. (*Id.* at 39–42). After speaking with Hebrank, Southwick and Wooddall interviewed a number of other individuals, including Shari Bowman, Susan Wourms, Sharon Yerian, Tina Landon, and Gary Ostoyic. (*Id.* at 42–48). None of those individuals reported seeing Hebrank act improperly toward Hall. Bowman reported, however, that Hebrank once made her feel uncomfortable by sitting in her lap. (*Id.* at 43). In her interview, Wourms became upset and stated that she would not participate in the investigation because she had made the company "aware" once before, and nothing had happened. (*Id.* at 46). Finally, in her deposition, Anita Lewis stated that Hebrank had once made a sexual comment to her, as she used a copying machine. Lewis never reported the comment, however, and Southwick learned about it after conducting his investigation into Hall's allegations. (Lewis depo. at 45; Southwick depo. at 66). After speaking with the foregoing employees, Southwick talked to Hebrank again. Southwick told Hebrank that he took Hall's complaint seriously, and that Hebrank could either transfer to one of the bank's branch offices or resign his position. (Southwick depo. at 51). Hebrank resigned shortly thereafter,

and he never returned to AmeriFirst. (*Id.*; Hall depo at 108).

In the wake of Hebrank's resignation, Hall felt ostracized by her co-workers. She overheard whispers involving her name and Hebrank's name. If she turned around, the talking stopped. (Hall depo. at 64). Pete Williams quit eating lunch with her because it was "damaging" to be seen with her. (*Id.* at 65). Gary Ostoyic refused to let her work for him because he "liked to joke with the girls in his department." (*Id.* at 66). Ostoyic, however, was not an employee of AmeriFirst. Rather, he worked for Invest, a bank service provider that received referrals from AmeriFirst and provided its customers with stocks, bonds, mutual funds, and annuities. (Southwick depo. at 49–50). According to Hall, Southwick also began "avoiding" her, and he "seemed like he didn't want to deal with [her]." (Hall depo. at 62). Hall also felt harassed because Southwick sometimes met with her "secretly," by having her use the back steps. (*Id.* at 63–64). Two such instances that Hall recounted in her deposition both related to AmeriFirst's handling of Hebrank's alleged harassment. On the first occasion, Hall was asked to use the back steps when she met with Southwick and Wooddall during their on-site investigation. (Hall depo. at 63–64). Hall also used the back steps when Southwick met with her to show her an E-mail that he was circulating about Hebrank's resignation. (*Id.* at 63). Hall also felt like her co-workers were being "judgmental" on one occasion, when she walked up a flight of stairs and observed a female employee squeezing a male employee's shoulders. When a third employee noticed Hall approaching, he signaled for the female employee to stop. (*Id.* at 64). Finally, Hall became uncomfortable when she received telephone calls from AmeriFirst customers regarding Hebrank's departure and either had to "defend him" or "lie." (*Id.* at 67). When Hall complained to Linda Bynum about the telephone calls, Bynum told her "tough it out" and have the

customers contact Southwick if the situation got any worse. (*Id.*).

As a result of the foregoing incidents occurring after Hebrank's resignation, Hall became depressed and resigned from her position with AmeriFirst on December 9, 1994. (*Id.* at 110, 111, and Exh. A). Hall subsequently filed a Complaint (Doc. # 2) against Hebrank, Mid Am, and AmeriFirst on November 14, 1995. Thereafter, the parties failed to file a joint discovery plan, and the Court dismissed Hall's Complaint, without prejudice to renewal (Doc. # 17). Hall then filed a new Complaint (Doc. # 20) on November 13, 1996, naming the same Defendants. As noted above, Hall's present Complaint includes sexual harassment and sexual discrimination claims under Title VII, as well as various pendant state-law claims. The Court has federal question jurisdiction over Title VII claims pursuant to 28 U.S.C. § 1331. The Court may exercise its supplemental jurisdiction over Hall's state-law claims pursuant to 28 U.S.C. § 1367, as these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

## II. *Summary Judgment Standard*

The Court first will set forth the parties' relative burdens once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb,* 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial[,]" quoting *Gutierrez v. Lynch,* 826 F.2d 1534, 1536 [6th Cir.1987] ). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law under Fed.R.Civ.P. 50. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Michigan Protection and Advocacy Service, Inc. v. Babin,* 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). Rather, Rule 56(e) "requires

the non-moving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are . . .'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, Federal Practice and Procedure § 2726.

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). *See also, L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to

summary judgment . . . ."), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, upon only those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

### III. *Analysis*

The Court begins its analysis with a review of Hall's Title VII claims against the Defendants. In Count IV of her Complaint (Doc. # 20), Hall alleges sexual harassment. In Count III, she alleges sexual discrimination. Before addressing the merits of Hall's claims, the Court notes that Hebrank may not be found personally liable under Title VII, even though Hall named him as a Defendant in her sexual harassment and sexual discrimination claims. *See Wathen v. General Elec. Co.*, 115 F.3d 400, 406 (6th Cir.1997) (concluding that "Congress did not intend individuals to face liability" under Title VII). The parties also dispute whether Mid Am may be found liable under Title VII as Hebrank's "employer." In particular, Mid Am contends that it is merely a "holding company," lacking sufficient connections with AmeriFirst to be found responsible for Hebrank's alleged Title VII violations. In light of the Court's determination, *infra*, that Hall's Title VII claims cannot withstand summary judgment, however, the Court need not decide whether Mid Am qualifies as Hebrank's employer. As a result, the Court turns now to the merits of Hall's sexual harassment and sexual discrimination allegations, and assumes arguendo, that Mid Am is Hall's employer for Title VII purposes.

### A. *Title VII Sexual Harassment*

Although Hall's Complaint is not specific, her Memorandum opposing summary judgment appears to allege both

"hostile work environment" and "quid pro quo" sexual harassment. (Doc. # 88 at 11, 14). In *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), the Supreme Court recently found the distinction between quid pro quo and hostile work environment sexual harassment relevant, but of limited importance. *Id.* at 2264. The vital issue in all sexual harassment cases is whether a supervisor's words and actions altered the terms or conditions of the plaintiff's employment. *Id.* at 2264. In a "hostile work environment" situation, a supervisor's demeaning behavior does not alter the terms or conditions of employment, and give rise to Title VII liability, unless it is severe or pervasive. *Id.* at 2264–2265. In a "quid pro quo" situation, however, Title VII liability exists if a plaintiff shows that her supervisor took some "tangible employment action" as a result of the plaintiff's refusal to submit to sexual demands. (*Id.* at 2264–2265).[3] In such cases, the supervisor's conduct explicitly and necessarily alters the terms or conditions of employment, thereby giving rise to a Title VII sexual harassment claim. (*Id.*).

■ The *Burlington Industries* Court also clarified the circumstances under which an employer may be held liable for sexual harassment committed by a supervisory employee. Significantly, the Court first concluded that an employer is vicariously liable for all sexual harassment committed by a supervisor. *Id.* at 2270. Under some circumstances, however, an employer may avoid liability or damages by raising an affirmative defense and proving the defense by a preponderance of the evidence. *Id.* Specifically, when a supervisor has engaged in offensive conduct that constitutes legally actionable sexual harassment, but has not taken any tangible employment action, an employer may establish the affirmative defense by demonstrating: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid the harm otherwise." *Id.* This affirmative defense is unavailable, however, "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Id.* In instances when the affirmative defense *is* available, "[p]roof that an employer had promulgated an anti-harassment policy with [a] complaint procedure is not necessary in every instance as a matter of law, [but] the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid the harm is not limited to showing unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure normally will suffice to satisfy the employer's burden under the second element of the defense." *Id.*; *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2292–2293, 141 L.Ed.2d 662 (1998) (adopting the same standards for supervisor sexual harassment that the Court set forth in *Burlington Industries* ).

■ In the present case, the record reflects that Hall found Hebrank's words and actions offensive, but the Court finds no evidence that his objectionable conduct

---

**3.** A "tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Industries,* 118 S.Ct. at 2268. "Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates. A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors." *Id.* at 2269.

culminated in a tangible employment action. In support of such a claim, Hall presents a five-sentence argument in which she notes that she assumed additional responsibilities after Hebrank's departure, and that she was not asked to resign. Hall also contends that she was unaware of Hebrank's effort to procure a $5,000 raise for her while acting as her supervisor. Finally, Hall notes that AmeriFirst's employees avoided her after her complaint about Hebrank. (Doc. # 88 at 14).

■ Upon review, however, the Court cannot envision Hebrank's documented effort to obtain a substantial raise for Hall, or her assumption of additional responsibility, being considered an *adverse* tangible employment action. Additionally, the treatment Hall received from co-workers occurred after Hebrank's resignation. Even if Hall found this treatment offensive, like Hebrank's conduct, it did not culminate in a tangible employment action. Even more importantly, the co-workers' treatment of Hall was not the product of sexual animus. Rather, the record demonstrates that, to the extent Hall was ignored and given the "cold shoulder," those actions were in response to her complaint about Hebrank. Title VII prohibits discrimination by an employer against any individual "because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1). *Cf. Richmond-Hopes v. City of Cleveland,* 1998 WL 808222 at *7 (6th Cir. Nov.16, 1998) (unpublished) (finding no viable sexual harassment claim when the plaintiff "was isolated and disparaged by her supervisor and co-workers not based on sex, but because she filed a sexual harassment complaint"). The remaining question, then, is whether Hebrank's conduct was severe or pervasive enough to alter the terms or conditions of Hall's employment. If so, liability for sexual harassment under Title VII will exist, subject to the available affirmative defense set forth in *Burlington Industries.*

As noted above, Hebrank's conduct consisted of numerous "touchings" that Hall found offensive. According to Hall, Hebrank placed his hand on her leg and touched, squeezed, or rubbed it two or three times a week, unless they were accompanied by a third party. Ultimately, Hebrank began touching her just under the skirt hem. This conduct arguably might qualify as severe, and a reasonable trier of fact certainly could find it objectionable and pervasive, based upon its frequency. Hall also testified that Hebrank regularly followed her around work, and his actions became an office joke. Although this conduct might not be severe, a reasonable trier of fact could find that it contributed to a hostile work environment and altered the conditions of Hall's employment, particularly when considered in the context of Hebrank's other conduct, which included: (1) staring at Hall's lower body and legs; (2) simulating oral sex with a pudding cup; (3) singing the song, "I'll Make Love to You," while alone in the car with Hall; (4) pressing his body against Hall on two occasions with enough force that she felt his groin; (5) driving past Hall's house; (6) regularly attempting to walk her outside; (7) introducing her as "the looks in the marketing department"; and (8) sitting as close to Hall as possible while they reviewed a single photocopy. Although any one of these acts, standing alone, could not be considered severe or pervasive enough to have altered the conditions of Hall's employment, the Court cannot say, as a matter of law, that they are insufficient cumulatively. Therefore, construing the evidence, and all reasonable inferences, in a light most favorable to Hall, the record reflects a genuine issue of material fact as to whether Hebrank created a legally actionable hostile work environment.[4] *Cf. Abeita v. TransAmerica Mailings, Inc.,* 159 F.3d 246, 252 (6th Cir.

---

**4.** Contrary to the Defendants' assertions, the Court is unpersuaded that Hall's allegations are "ordinary tribulations of the workplace." (*See* Doc. # 85 at 7).

1998) (finding a genuine issue of material fact precluding summary judgment on the plaintiff's hostile work environment claim, based solely upon "commonplace, ongoing, and continual" sexual statements made by the plaintiff's supervisor).

 Because no "tangible employment action" occurred, however, the Defendants may utilize the affirmative defense set forth in *Burlington Industries*, 118 S.Ct. at 2270. To do so, the Defendants must establish, by a preponderance of the evidence, (1) that they exercised reasonable care to prevent and cure any harassment *and* (2) that the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer, or otherwise to avoid the harm. *Id.* After reviewing the record, and construing the evidence and all reasonable inferences most strongly in Hall's favor, the Court finds, as a matter of law, that Mid Am and AmeriFirst have established the affirmative defense articulated in *Burlington Industries*.

Hall worked in AmeriFirst's marketing department from October, 1994, through early December, 1994. In September, 1994, before coming under Hebrank's supervision, Hall received a copy of AmeriFirst's employee manual. (Doc. # 85 at Exh. A, attachments 1 and 2). The manual includes a section captioned, "**SEXUAL HARASSMENT POLICY**." (*Id.* at attachment 1, p.43) (capitalization and bold type in original). The policy explains that sexual harassment is prohibited. It also defines sexual harassment generally as "unwelcome sexual behavior." The policy then notes that sexual harassment could be committed by supervisors or non-supervisory employees. It contains a non-exclusive list of sexually harassing behavior, including: (1) verbal abuse of a sexual nature; (2) graphic or offensive comments about an individual's body; (3) unwanted flirtations, propositions, or physical contact; (4) sexually degrading words to describe an individual; or (5) the display of sexually suggestive drawings, posters, or pictures. (*Id.* at 43–44). The manual then informs employees about how to report sexual harassment:

"Employees who have complaints of sexual harassment or who have witnessed sexual harassment should report the conduct to their supervisor as soon as possible. All complaints of harassment will be investigated promptly, impartially, thoroughly, and confidentially. If an employee is not satisfied with the way a complaint is handled by a supervisor, or if the supervisor is the problem, employees should bring this to the attention of the Human Resources Officer. If an employee still is not satisfied, then he or she should contact the Human Resources Officer of Mid Am, Inc. In all cases, the employee will be advised of the findings and conclusion after the investigation is complete."

"Any employee found, after appropriate investigation, to have engaged in harassment of another employee will be subject to prompt disciplinary action, depending upon the circumstances, up to and including termination...."

(*Id.* at 44). On September 1, 1994, prior to working with Hebrank, Hall signed an "Acknowledgment and Receipt," in which she acknowledged receiving the AmeriFirst handbook, and fully understanding its contents. (*Id.*, at attachment 2).

In addition to having in place a sexual harassment policy, which Hall acknowledged understanding, the record reflects that AmeriFirst acted almost immediately to remedy the situation, once Hall brought it to the attention of the Human Resources Department. As noted above, Pete Williams, an AmeriFirst officer, first discovered Hall crying in a dark office on a Tuesday. (Hall depo. at 80). He told Hall that he would report her allegations to the Human Resources Department if she did not do so. (*Id.* at 82). The next morning, Hall spoke with Linda Bynum and Anita Lewis, who suggested that she should write Hebrank a letter and avoid being alone with him. (*Id.* at 96). Hall wrote a

letter and gave it to Hebrank late that day, as he walked out of the door to leave work. After reading the letter outside, Hebrank returned and spoke briefly with Hall. (*Id.* at 98–99). ⸱ He appeared "frantic" and "pale," and he apologized for having her sit close to him on one occasion. (*Id.*). After that meeting, she never saw him at AmeriFirst again. (*Id.* at 97, 108).

Hall began a pre-planned vacation the following day, which was Thursday. Friday was a holiday, and Hall had also taken off the Monday following the weekend as a vacation day. (*Id.* at 97, 101). When Hall did not report to work on Tuesday, she spoke with Bynum, who then reported Hall's allegations to Southwick. That same day, Southwick interviewed Hall in person, contacted the president and CEO of Mid Am, placed Hebrank on suspension, and afforded Hall the opportunity to stay home, with pay, for the remainder of the week. (Southwick depo. at 30–31; Hall depo. at 105–106). The following day, Southwick and Wooddall, a Mid Am representative, began investigating Hall's allegations by speaking with several employees, including Hall and Hebrank, whom they met off of the AmeriFirst property.[5] Although Southwick and Wooddall failed to confirm Hall's specific complaints, they did hear allegations that Hebrank had acted inappropriately on other occasions. Southwick subsequently spoke with Hebrank again and refused to let him work in Hall's building. Instead, Southwick gave Hebrank the option of either resigning or working in a satellite office, and Hebrank opted to resign from his position as an AmeriFirst vice-president.

Given these facts, the Court concludes, as a matter of law, that AmeriFirst and Mid Am exercised reasonable care to prevent and correct promptly Hebrank's harassing behavior. The Defendants maintained a comprehensive sexual harassment policy and provided Hall with a copy of that policy. Although Hall now contends that she did not read the policy, she acknowledged understanding its contents in September, 1994. The Defendants can not be held accountable for Hall's failure to read the policy that AmeriFirst provided. Moreover, Hall admits never reporting Hebrank's conduct to AmeriFirst's management before speaking with Bynum and Lewis on a Wednesday, even though the company's sexual harassment policy instructed her to contact the Human Resources Department.

■■■ In her Memorandum opposing summary judgment, Hall insists that Bynum and Lewis acted improperly by telling her to write Hebrank a letter. Even if that advice was erroneous, however, the Court finds no prejudice to Hall, given the particular facts of this case. As a result of Bynum's and Lewis' advice, Hall wrote Hebrank a letter and met with him only briefly before he left for the day. Thereafter, she never saw Hebrank at AmeriFirst again. Hall immediately began a vacation, and Southwick had suspended Hebrank by the time she returned. Given that Hall reported her allegations to the Human Resources Department on a Wednesday, and Southwick suspended Hebrank less than one week later, without Hall ever having to work with him again, the Court concludes, as a matter of law, that the Defendants promptly corrected the harassing behavior.[6]

---

5. The investigation conducted by Southwick and Wooddall culminated in an eight-page, comprehensive report prepared by Wooddall. (Southwick depo. at Exh. 2). The report describes, with particularity, her interviews with several bank employees as part of AmeriFirst's and Mid Am's effort to substantiate Hall's allegations. The prompt and thorough nature of the investigation demonstrates that the Defendants took Hall's complaint seriously and reacted appropriately.

6. In reaching this conclusion, the Court does not suggest that Bynum and Lewis provided sound advice by instructing Hall to write Hebrank a letter expressing her complaints. In fact, the Court can envision circumstances under which such instructions from a Human Resources Department representative might call into question whether an employer exercised reasonable care to prevent additional harassment. Under the particular facts of

 .Having reached the foregoing conclusion, the Court pauses briefly to address one additional issue touched upon in Hall's Memorandum opposing summary judgment. Specifically, Hall alleges that the Defendants knew about Hebrank's sexual harassment of other women prior to the sexual harassment at issue in the present case. Although Hall has not raised this issue in connection with her Title VII sexual harassment claim,[7] it warrants further discussion at this juncture. On at least one occasion, the Sixth Circuit has recognized that an employer's knowledge of a supervisor's prior sexual misconduct is relevant when determining whether the employer adequately responded to a plaintiff's sexual harassment complaint. In *Yates v. Avco Corp.*, 819 F.2d 630 (6th Cir.1987), the plaintiffs were two former employees of the defendant company. In 1983, the company heard allegations that a supervisor had been sexually harassing the plaintiffs. *Id.* at 632–633. The company commenced an investigation and ultimately removed the supervisor from his position of authority over the women.[8] *Id.* at 633. The court noted, however, the existence of evidence suggesting that the supervisor at issue had harassed other women in 1980, and that the employer had known about the harassment and had failed to take any action. *Id.* at 635–636. Thus, although the company "took remedial action once the plaintiffs registered complaints," the

Court reasoned that "its duty to remedy the problem, or at a minimum, inquire, was created earlier when the initial allegations of harassment were reported." *Id.* at 636. In *Yates*, however, · one of the earlier harassment victims testified that she had mentioned the supervisor's harassment to a member of the company's management. *Id.* at 635. Additionally, the company's director of personnel testified that another victim had approached him in 1982, complaining about the supervisor's sexual advances. *Id.* at 635–636.

In the present case, however, Hall relies primarily upon inadmissible hearsay to establish the Defendants' awareness of Hebrank's prior inappropriate behavior. Although she cites deposition testimony from several individuals, none of the testimony may be used to establish AmeriFirst's or Mid Am's awareness of Hebrank's propensity to engage in sexual harassment. *First*, Hall cites Don Southwick's testimony concerning his investigation interview with AmeriFirst employee Susan Wourms. (Doc. # 88, citing Southwick depo. at 45–46). According to Southwick, Wourms told him "that she had made us aware before and that nothing had happened." (Southwick depo. at 46). Wourms' purported statement is clearly hearsay, since it is a statement, other than one made by the declarant Wourms testifying under oath, offered as evidence to prove the

---

this case, however, the Court finds no harm resulting to Hall as a result of Bynum's and Lewis' questionable advice. After giving Hebrank her letter, and speaking with him briefly about its contents, Hall never saw Hebrank at AmeriFirst again. As a result, no additional harassment · occurred. The Court also notes that Bynum *did* suggest reporting Hall's allegations to Southwick, just days later, when she discovered that Hall remained upset. (Hall depo. at 103). Furthermore, upon discovering Hall's allegations, Southwick instructed Bynum and Lewis to report all future sexual harassment complaints immediately, rather than having the employee write her supervisor a letter. (Southwick depo. at 36–37). In light of these facts, the Court finds no basis for depriving the Defendants of the *Burlington Industries* affirmative defense.

7. In support of her negligent hiring, retention, and entrustment claim (Doc. # 20, Count II), Hall contends that AmeriFirst and Mid Am were aware of Hebrank's propensity to engage in sexual harassment before he engaged in objectionable conduct with her.

8. Unlike the present case, however, the investigation in *Yates* did not proceed smoothly. Among other things, the company urged the plaintiffs not to contact the EEOC, refused to give them transcripts of their tape recorded statements made in connection with the company's investigation, and forced them to take extended sick leave without ever reinstating that leave. *Id.* at 633.

truth of the matter asserted, i.e. that AmeriFirst knew about Hebrank's conduct and took no action. Additionally, the statement does not appear to qualify under any of the hearsay exceptions provided in Fed.R.Evid. 803, and Hall cites no such exception.[9] *Second,* Hall notes Anita Lewis' admission that Hebrank made one isolated lewd comment to her before she ever worked in a human resources capacity. (*Id.* at 46–47). Lewis never complained about the comment, however. (*Id.* at 47). Thus, AmeriFirst cannot be faulted for failing to investigate the incident or reprimand Hebrank. In any event, one offensive comment cannot be deemed sufficient to apprise the Defendants of a need to remedy a hostile work environment. *Third,* Hall cites Southwick's deposition testimony concerning his investigation interview with AmeriFirst employee Shari Bowman. (Doc. # 88 at p.22, citing Southwick depo. at 43). According to Southwick, Bowman told him that Wourms had told her Hebrank's conduct had been discussed with management before. (Southwick depo. at 43). This statement presents "double" hearsay and, once again, it is offered for the truth of the matter asserted, i.e. that "management" knew about Hebrank's behavior. *Fourth,* Hall refers generally to pages 44 through 47 of Southwick's deposition testimony. The only additional allegations in those pages relate to his interviews with AmeriFirst employees Sharon Yerian and Tina Landon. According to Southwick, Yerian told him that Hall had expressed her discomfort with Hebrank's behavior. (*Id.* at 44). In addition to being hearsay, this testimony establishes only that Hall confided in Yearian, who was not an AmeriFirst officer. Southwick next testified that Landon told him about one occasion when Hebrank picked two hairs from her sweater. (*Id.* at 47). Landon did not report the incident, and, therefore, it cannot be used to demonstrate the Defendants' knowledge of Hebrank's propensity to engage in sexual harassment. *Finally,* Hall cites page 165 of Southwick's deposition to show the Defendants' prior knowledge. Southwick's deposition, however, only contains 89 pages.[10] The Court also notes, sua sponte, that, according to Hall, Sheri Bowman once told her "that she and two other employees had tried to make a formal complaint against [Hebrank] but they were told to quit causing trouble." (Hall deposition at 82). Like most of Hall's other allegations, however, Bowman's purported statement to Hall is inadmissible hearsay. It is a statement, other than one made by the declarant Bowman testifying under oath, offered as evidence to prove the truth of the matter asserted, i.e. that AmeriFirst knew about Hebrank's conduct and took no action. Notably absent from Hall's Memorandum opposing summary judgment are any affidavits from the declarants mentioned above.

In any event, even assuming arguendo that the Defendants had some prior knowledge about the Defendant making inappropriate comments or otherwise engaging in objectionable behavior, the Court would be disinclined to find the *Burlington Industries* affirmative defense unavailable. To the extent that they pro-

**9.** Wourms' statement also does not qualify as non-hearsay under Fed.R.Evid. 801(d)(2)(D), as an admission of a party opponent. Wourms' statement did not concern a matter within the scope of her employment with AmeriFirst, such that it would qualify as an admission by the Defendant.

**10.** The Court notes that on page 65, as opposed to 165, Southwick explained that he learned from Anita Lewis, after completing his investigation, that someone once had complained about Hebrank before Southwick ever joined AmeriFirst. (Southwick depo. at 65–66). Southwick's and Wooddall's investigation report reveals the nature of the incident and AmeriFirst's response to the complaint. According to that report, an AmeriFirst representative spoke with Hebrank in 1992 after receiving a complaint about his "making comments and telling stories." The complaint did not involve any touching. The company representative addressed the complaint, "and nothing happened after that." (Southwick depo. at Exh. 2, p.5).

vide any specificity, none of the foregoing allegations appear to depict anything more serious than vague and isolated inappropriate comments. They *do not* establish the Defendants' awareness that Hebrank had created a legally actionable hostile work environment sufficient to warrant removing him from a position of authority. Furthermore, in recent decision, the Sixth Circuit affirmed the District Court's entry of summary judgment in favor of an employer, reasoning that an employer's awareness of a supervisor's past misconduct is less important that its prompt and effective response to a plaintiff's present complaint of sexual . harassment. *See Crossman v. Parker Hannifin Corp.*, 132 F.3d 32, 1997 WL 778115 (6th Cir. Dec.11, 1997) (unpublished) ("Even if a supervisor's harassing actions were foreseeable to an employer, that employer may negate its liability by 'adequately and effectively' responding to the harassment. In this case, the district court properly found that [the plaintiff] prevented [the employer] from responding to [the supervisor's] actions by deliberately deciding not to report them, despite numerous opportunities to do so . . . .").

■ The only remaining issue, then, is whether Hall unreasonably failed to take advantage of the preventative or corrective opportunities provided by the Defendants. *Burlington Industries,* 118 S.Ct. at 2270. Construing the evidence and all reasonable inferences in a light most favorable to Hall, the Court concludes that the Defendants have established this element of their affirmative defense. As noted above, AmeriFirst had an established sexual harassment policy that included a reporting procedure. Hall acknowledged receiving and understanding this policy. Nevertheless, she admits not reporting Hebrank's actions until speaking with Bynum and Lewis, even though Hebrank's objectionable conduct had occurred for approximately eight weeks. Equally importantly, after Hall reported Hebrank to the Human Resources Department, she saw

him again only once that day and never worked with him again. Finally, the Defendants offered Hall free counseling, during work hours, and with no loss of pay. Given these facts, no reasonable trier of fact could hold AmeriFirst or Mid Am responsible for any injury or damages that Hall has suffered as a result of Hebrank's conduct. As the Supreme Court recognized in *Burlington Industries,* 118 S.Ct. at 2270, an employee's unreasonable failure to utilize an employer's complaint procedure "will normally suffice to satisfy the employer's burden under the second element of the [affirmative] defense." In the present case, the Court concludes that Hall's failure to follow AmeriFirst's complaint procedure, until shortly before Hebrank's suspension, establishes the Defendants' affirmative defense as a matter of law. Accordingly, the Defendants are entitled to summary judgment on the Title VII sexual harassment claim in Count IV of Hall's Complaint (Doc. # 20).

#### B. *Title VII Sexual Discrimination*

■ In Count III of her Complaint, Hall alleges sexual discrimination in violation of Title VII. Specifically, she contends Mid Am and AmeriFirst discriminated against her by treating her differently than similarly situated male employees. (Doc. # 20 at 4). In support of her claim, Hall provides the following brief argument:

"In the instant case, the Plaintiff was, without question, a member of a protected class (female) and qualified for the job (admitted by Defendants that she was a good employee and they wanted her to stay). The disparate treatment arose when the Plaintiff attempted to comply with Mid Am, Inc.'s sexual harassment policy by complaining about Mr. Hebrank. It was allegedly the Bank's policy that sexual harassment had a zero tolerance level. The Plaintiff's 'reward' for attempting to utilize and enforce the Bank's policy was to be disparately treated like an outcast. This

treatment was illegal in its effect on the Plaintiff even though the Bank's policy (to not tolerate sexual harassment) was neutral on its face. The Bank's actions, which were carried out by personnel at every level, treating the Plaintiff as if she had done something wrong caused her severe damage."

"Critically, it is not necessary for the Plaintiff to prove any discriminatory motive. All Plaintiff need do is challenge the consequences of the Bank's practice (i.e. what i[t] actually did to her) by rejecting her. By rejecting her, the Bank created a psychological upheaval in the Plaintiff which was eventually diagnosed by Dr. Cherry."

(Doc. # 88 at 17–18).

Upon review, the Court finds Hall's Title VII disparate treatment claim inadequate for several reasons. At the outset, the Court notes that nothing in the record suggests Hall ever presented her disparate treatment claim in administrative proceedings before the Ohio Civil Rights Commission. In an affidavit, Hall avers that she met with a representative of the Ohio Civil Rights Commission on January 13, 1995, and filed *sexual harassment* charges with the agency the same day. (Doc. # 88 at Exh. 1, ¶ 17, 19). Unfortunately, Hall has not attached to her Memorandum opposing summary judgment a copy of her January 13, 1995, OCRC filing. Consequently, nothing before the Court indicates that she ever raised disparate treatment *sexual discrimination* charges before the OCRC. In *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246 (6th Cir.1998), the Sixth Circuit recently held that the District Court properly dismissed a Title VII retaliation claim when, in her EEOC complaint, the plaintiff neither checked the "retaliation" box, nor recited facts indicating that she might have a retaliation claim. *Id.* at 254. In support of its ruling, the Sixth Circuit explained: "Federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can reasonably be expected to grow out of the EEOC charge." *Id.* In the present case, Hall's affidavit does not suggest that she raised a Title VII disparate treatment sex discrimination claim before the OCRC. Furthermore, absent a copy of her OCRC charge, the Court cannot determine whether she alleged facts from which such a charge reasonably might be expected to arise. On its face, Hall's sex discrimination claim, premised upon co-worker hostility *after* Hebrank's departure, *does not* appear related to her sexual harassment claim against Hebrank to such a degree that it reasonably might be expected to arise from the harassment claim. *See Ang v. Procter & Gamble Co.*, 932 F.2d 540, 545 (6th Cir.1991) ("In order for federal courts to have subject matter jurisdiction of Title VII claims, the claimant must first unsuccessfully pursue administrative relief.... The judicial complaint must be limited 'to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination.' "). In any event, absent a copy of Hall's January 13, 1995, OCRC charge, the record is devoid of evidence from which the Court could discern that Hall properly raised her discrimination claim before the OCRC.[11] As a result, the Court lacks subject matter jurisdiction over Hall's Title VII disparate treatment claim premised upon co-worker

---

**11.** Dismissal of Hall's disparate treatment claim is particularly appropriate given that she filed her OCRC sexual harassment charge with the assistance of counsel. (*See* Doc. # 88, Hall affidavit at ¶¶ 17–19). When a charge before the administrative agency includes factual allegations that arguably might support multiple Title VII claims, courts are inclined to construe the charge broadly if the claimant filed the charge without the assistance of counsel. Liberal construction, however, "is not necessary where the claimant is aided by counsel in preparing his charge." *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 546 (6th Cir.1991). In the present case, of course, the Court could not possibly construe Hall's OCRC charge broadly, given her failure to provide the Court with a copy of the charge.

hostility following Hebrank's departure. *Abeita,* 159 F.3d at 254.[12]

Furthermore, even if the Court possessed jurisdiction over Hall's disparate treatment claim, it would find the claim unpersuasive. In support of her claim, Hall cites only *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).[13] Her argument and citation to *St. Mary's Honor Center* make clear that she is attempting to demonstrate disparate treatment by raising an inference of discrimination. Hall's Memorandum opposing summary judgment reveals that she is attempting to establish a prima facie case of disparate treatment pursuant to *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a prima facie case under *McDonnell Douglas,* Hall must show (1) that she was a member of a protected class, (2) that she suffered an adverse employment action, (3) that she was qualified for the position, and (4) that she was replaced by a person outside the protected class. *Id.* at 802, 93 S.Ct. 1817; *Abeita,* 159 F.3d at 253. In the present case, however, Hall's claim fails as a matter of law because, after she resigned from AmeriFirst, she was replaced by a female. (Doc. # 85, Bynum affidavit at ¶ 5). Consequently, even assuming arguendo that Hall's resignation could be deemed an "adverse employment action," no inference of gender discrimination exists.[14] Furthermore, to the extent

12. In reaching this conclusion, the Court distinguishes Hall's apparent failure to raise her sex discrimination claim before the OCRC from her failure to provide the Court with a copy of a "right to sue" letter from the OCRC. In their Motion for Summary Judgment, the Defendants seek summary judgment on Hall's Title VII claims, because she has not produced a "right to sue" letter from the administrative agency. A plaintiff's failure to obtain a "right to sue" letter is not a jurisdictional bar to presenting Title VII claims in federal court. *Rivers v. Barberton Bd. of Educ.,* 143 F.3d 1029, 1031 (6th Cir.1998). Rather, receipt of a "right to sue" letter is a waivable condition precedent to maintaining a Title VII action in such a court. *Id.* In *Da Hua Non–Ferrous Metals Co., Ltd. v. W.D. Mask Cotton Co.,* 113 F.3d 1234, 1997 WL 234610 (6th Cir. May 6, 1997) (unpublished), the Sixth Circuit recognized that conditions precedent are affirmative defenses that may be waived if not raised in a defendant's responsive pleading. In the present case, the Defendants did not raise the absence of a "right to sue" letter as an affirmative defense. Nevertheless, in *Moore, Owen, Thomas & Co. v. Coffey,* 992 F.2d 1439, 1445 (6th Cir.1993), the Sixth Circuit also recognized that "failure to raise an affirmative defense by responsive pleading does not always result in waiver." In *Moore,* the Court reasoned that waiver need not apply if a defendant raises an affirmative defense in a manner that does not prejudice the plaintiff's ability to respond. *Id.* In the present case, the Defendants raised the absence of a "right to sue" letter in their Motion for Summary Judgment, which was filed in this Court on December 1, 1998. In response, Hall avers that she "always thought" her at-

torney had received the letter. (Hall affidavit at ¶ 22). She also avers that she is "attempting to contact appropriate personnel" to determine if such a letter ever was issued. (*Id.* at ¶ 24). More than six weeks have passed, however, since the Defendants put Hall on notice about the absence of a "right to sue" letter, and Hall still has not produced such a letter. Under these circumstances, the Court is inclined to find no prejudice to Hall arising from the Defendants' failure to raise the issue sooner. Hall has had more than six weeks to contact the OCRC and obtain a "right to sue" letter. Absent such a letter, her Title VII claims are subject to dismissal, thereby providing the Court with an alternative basis for finding the disparate treatment claim meritless. *Portis v. State of Ohio,* 141 F.3d 632, 635 (6th Cir.1998).

13. Hall quotes *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), for the following proposition: "The burden of proving a prima facia case of disparate treatment is not onerous. The Plaintiff must prove by a preponderance of the evidence that she applied for a position for which she was qualified, but was rejected under circumstances which gave rise to an inference of unlawful discrimination." Although the Court does not dispute Hall's general statement of the law, it notes that nothing resembling Hall's quote appears anywhere in *St. Mary's Honor Center.*

14. Contrary to Hall's assertion that she need not prove discriminatory motive, the Court notes that the very essence of the prima facie case requirement is that it establishes a rebut-

that Hall seeks to compare herself with similarly situated male employees, her claim fails as a matter of law because she has not identified one similarly situated male whom AmeriFirst treated differently. Absent evidence that the Defendants treated similarly situated male employees differently, Hall cannot prevail. Finally, to the extent that Hall alleges sexual discrimination based upon her co-workers' reactions to her complaint, the record suggests that she was given the "cold-shoulder," not based upon her sex, but because she had reported Hebrank's conduct. Given that the alleged discrimination was not "because of sex," Hall cannot succeed on her gender-based disparate treatment claim as a matter of law. *Cf. Richmond-Hopes v. City of Cleveland,* 1998 WL 808222 (6th Cir. Nov.16, 1998) (unpublished) at *7 (reasoning that the plaintiff could not maintain a Title VII sexual harassment claim based upon hostility from her supervisor and co-workers, because the hostility was based, not upon her sex, but upon her filing of a sexual harassment complaint). Even with the evidence and all reasonable inferences construed most strongly in her favor, Hall simply has cited no evidence from which a trier of fact could conclude that the Defendants discriminated against her because of her gender. Accordingly, the Defendants are entitled to summary judgment on Count III of Hall's Complaint (Doc. # 20).

C. *Potential Title VII Constructive Discharge Claim Based upon Unlawful Retaliation*

In the interest of completeness, the Court briefly will address a constructive discharge claim suggested, but not raised, by Hall's Complaint. (Doc. # 20). As noted above, the only Title VII claims expressly presented in Hall's four-count Complaint allege sexual harassment (Count IV) and disparate treatment sexual discrimination (Count III). In an introductory "Background" portion of her Complaint, however, Hall includes one sentence asserting that she "was forced to constructively resign her position." (Doc. # 20 at ¶ 17). In recognition of this apparent reference to constructive discharge, the Defendants have moved for summary judgment on Hall's constructive discharge "claim." Because the isolated reference to constructive discharge is not found in any count of Hall's Complaint, the Court cannot ascertain whether to treat the "claim" as alleging common law constructive discharge under Ohio law, constructive discharge under Ohio statutory law, or constructive discharge under Title VII. For present purposes, however, the Court will assume, arguendo, that Hall is alleging constructive discharge under Title VII.

■ "A finding of constructive discharge in this circuit requires an inquiry into both the objective feelings of an employee, and the intent of the employer. A constructive discharge exists if 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Yates v. Avco Corp.,* 819 F.2d 630, 636 (6th Cir.1987), quoting *Held v. Gulf Oil Co.,* 684 F.2d 427, 432 (6th Cir.1982).

■ In response to the Defendants' Motion for Summary Judgment on her constructive discharge claim, Hall alleges that, following Hebrank's departure, she "returned to an atmosphere of resentment and systematic rejection." (Doc. # 88 at 24). In support, Hall contends: (1) that Don Southwick met with her "incognito"

---

table presumption of intentional discrimination. *See Grano v. Department of Development of City of Columbus,* 637 F.2d 1073, 1081 (6th Cir.1980) (recognizing that in disparate treatment cases, "discriminatory motive is critical, although sometimes it can be inferred from the mere fact of differences in treatment").

In the present case, no inference of discrimination exists. Hall received no reduction in her pay or decrease in her job responsibilities following her complaint. To the contrary, she received additional responsibility, and Don Southwick asked her not to resign from her employment.

and required her to take a back staircase; (2) that Gary Ostoyic refused to let her transfer to his department, because he liked to "joke around"; (3) that Pete Williams did not want to be seen with her; and (4) that her co-workers "scattered" when they saw her.

At the outset, the Court notes Hall's reliance upon events that occurred after Hebrank's resignation to support her constructive discharge claim. In essence, Hall's allegations appear to be premised upon what she perceives as retaliatory hostility toward her in the wake of her sexual harassment complaint. As a result, the Court will construe her Complaint as setting forth a constructive discharge claim based upon unlawful retaliation in violation of Title VII.[15]

In *Richmond-Hopes v. City of Cleveland,* 1998 WL 808222 (6th Cir. Nov.16, 1998) (unpublished), the plaintiff also raised a Title VII retaliation claim based upon hostility that she experienced at work after filing a sexual harassment complaint against her supervisor. *Id.* at *1–2. Consequently, the Sixth Circuit considered whether her supervisor's actions of "isolating her from the rest of the department by ignoring her, calling her a 'bitch' behind her back to other employees, and actively encouraging the other employees to ostracize her" could constitute an "adverse employment action" and support a prima facie retaliation case. *Id.* at *7–8.

In the present case, however, the Court once again notes the absence of any evidence suggesting that Hall presented a retaliation charge to the OCRC, or provided the agency with facts from which such a charge reasonably could be expected to arise. Hall has not provided the Court with a copy of her OCRC charge, and her affidavit states only that she filed a charge of sexual harassment with the agency. As noted above, the Sixth Circuit recently recognized that "[f]ederal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can reasonably be expected to grow out of the EEOC charge." *Abeita,* 159 F.3d at 254. Although retaliation claims "are generally excepted from this filing requirement because they usually arise after the filing of the EEOC charge[,]" the "exception does not apply to retaliation claims based upon conduct that occurred before the EEOC charge was filed." *Id.* In the present case, Hall avers that she met with the OCRC and filed a sexual harassment charge *after* terminating her employment with AmeriFirst. (Hall affidavit at ¶¶ 17–19, Doc. # 88 at Exh. 1). As a result, any retaliatory action that culminated in Hall's constructive discharge necessarily occurred *before* she filed her OCRC sexual harassment charge. Consequently, Hall's OCRC charge could have included such allegations of retaliation. Accordingly, the Court lacks subject matter jurisdiction over her constructive discharge claim premised upon co-worker retaliation.

Finally, for purposes of completeness, the Court notes that it would find Hall's constructive discharge claim unavailing, even if it did possess subject matter jurisdiction. In *Richmond-Hopes,* the

---

15. Although constructive discharge also may result from sexual harassment or sexual discrimination, the Court already has determined, *as a matter of law,* that Hall cannot maintain a cause of action for either Title VII sexual harassment or disparate treatment sexual discrimination. Given that the Defendants are entitled to judgment on both causes of action as a matter of law, Hall likewise cannot establish constructive discharge premised upon Hebrank's sexual harassment or her co-workers' alleged disparate treatment sexual discrimination. As noted above, AmeriFirst and Mid Am are not responsible for the harm that Hebrank caused Hall, because (1) they had an effective anti-harassment policy in place, (2) they promptly corrected the situation, and (3) Hall failed to report the harassment sooner. Thus, the only viable avenue for Hall to establish her constructive discharge claim is· by demonstrating co-worker retaliation, in violation of Title VII, in response to her complaint about Hebrank.

plaintiff's supervisor held meetings with other employees and disparaged her for filing a sexual harassment charge against him. In those meetings, he told the employees that the plaintiff would get everyone in trouble, he advised them not to talk to her, and he told them that she "was taking food off their kids' tables." *Richmond-Hopes*, 1998 WL 808222 at *9. In the present case, however, the record does not suggest that Hall's supervisors orchestrated a campaign to ostracize her, or that they fostered an atmosphere of antagonism and hostility, such that she would feel compelled to resign. Rather, Hall alleges in her memorandum opposing summary judgment that co-workers avoided her and talked about her, that Pete Williams refused to continue eating lunch with her or be seen with her, that Gary Ostoyic refused to let her work for him, and that Don Southwick made her use the back steps and met her "incognito." Nothing in the record, however, suggests that AmeriFirst's management knew about or encouraged the co-workers' reactions to Hall. Furthermore, Williams' refusal to eat with Hall during his personal lunch time certainly cannot be considered an adverse employment action, and his single comment about not being seen with her cannot reasonably be construed as severe or pervasive enough to have made Hall feel compelled to resign. In addition, nothing in the record refutes Don Southwick's testimony that Ostoyic was not an employee of AmeriFirst. In any event, Ostoyic had no obligation to encourage Hall to leave her marketing job and allow her to come work for him. Additionally, Southwick's instruction for Hall to use the back steps when visiting him appears related to his effort to keep the sexual harassment investigation confidential. By Hall's own admission, she used the back steps on two occasions when she visited Southwick in connection with her allegations against Hebrank. Under these circumstances, the Court would find the Defendants entitled to summary judgment on Hall's retaliation claim, even if she properly had raised it before the

OCRC and in her Complaint. In short, no reasonable trier of fact could find that AmeriFirst or Mid Am orchestrated a campaign to retaliate against Hall in response to her complaint against Hebrank, or knew about co-worker retaliatory harassment and acquiesced in a way that condoned and encouraged the retaliatory conduct. *See Richmond-Hopes*, 1998 WL 808222 at *9, citing *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1265 (10th Cir.1998). To the contrary, the record indicates that AmeriFirst and Mid Am offered Hall free psychological counseling, during work hours and with no loss of pay, for the duration of her employment. Additionally, Southwick offered her increased responsibilities as an inducement to remain with the bank. Under these circumstances, no reasonable trier of fact could conclude that the Defendants orchestrated a campaign of retaliation against Hall, or that they fostered an atmosphere unpleasant enough to make Hall feel compelled to resign. Accordingly, the Court would sustain the Defendants' Motion for Summary Judgment on Hall's constructive discharge claim based upon unlawful retaliation, if it had jurisdiction over the claim.

## IV. *Plaintiff's State–Law Claims*

Having disposed of Hall's federal claims, the Court declines to exercise supplemental jurisdiction over the various state-law claims found in Counts I, II, and IV of her Complaint (Doc. # 20). It is well settled that a District Court may decline to exercise supplemental jurisdiction over state claims once it has dismissed all claims over which it possessed original jurisdiction. *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 233 (6th Cir.1997). Indeed, the Sixth Circuit has recognized that if all federal claims are dismissed before trial, remaining state claims generally should be dismissed. *Id.; Taylor v. First of Am. Bank–Wayne*, 973 F.2d 1284, 1287 (6th Cir.1992). Consequently, the Plaintiff's state law claims are dismissed without

prejudice to refiling in a state court of competent jurisdiction.

## V. *Defendants' Motion to Strike Evidentiary Materials (Doc. # 93)*

Also pending before the Court is a Motion to Strike Evidentiary Materials (Doc. # 93) filed by the Defendants. In their Motion, the Defendants seek to strike a purported affidavit from Dr. Eugene S. Cherry, and portions of an affidavit from the Plaintiff. Both affidavits are attached to the Plaintiff's Memorandum in Opposition to Summary Judgment (Doc. # 88). Given the Court's determination (1) that the Defendants are entitled to summary judgment on the Plaintiff's Title VII sexual harassment claim, (2) that it lacks subject matter jurisdiction over the Plaintiff's claims alleging sexual discrimination and constructive discharge based upon unlawful retaliation, and (3) that the Plaintiff's state-law claims are dismissed without prejudice to refiling in state court, the Defendants' Motion to Strike (Doc. # 93) is OVERRULED as moot.

Nevertheless, the Court sets forth several non-exclusive observations concerning the merits of the Defendants' Motion to Strike. *First,* the Court finds persuasive the Defendants' argument that Dr. Eugene Cherry's "affidavit" is not properly before the Court. The document has not been notarized and, therefore, it does not constitute an affidavit upon which the Court may rely.[16] *Second,* the Court agrees that two averments contained in Hall's affidavit are inadmissible hearsay, to the extent that they are offered for the truth of the matter asserted.[17] *Third,* the Court cannot agree with the Defendants' argument that Hall's affidavit conflicts with her deposition testimony. In her deposition, Hall testified that she pinned her blouses and suits "as high as [she] could" to keep Hebrank from "looking." (Hall depo. at 71). This statement does not necessarily conflict with Hall's subsequent averment that she pinned her clothes to her underwear. (Doc. # 88 at Exh. 1 ¶ 11). Hall also testified in her deposition that she found Hebrank's conduct "demeaning" when he introduced her as the "looks" of the marketing department. (Hall depo. at 60). Finally, Hall testified that she found Hebrank "disgusting" when he licked his pudding without a spoon. (*Id.* at 70). These statements do not conflict with Hall's averment that she felt a "sense of terror" when she was alone with Hebrank in the car. (Doc. # 88 at Exh. 1 ¶ 12–13).

## VI. *Conclusion*

Based upon the foregoing analysis, the Court SUSTAINS the Defendants' Motion for Summary Judgment (Doc. # 85), insofar as it is directed toward the Title VII sexual harassment claim in Count IV of the Plaintiff's Complaint (Doc. # 20). The Plaintiff's Title VII disparate treatment sexual discrimination claim (Count III) is DISMISSED for lack of subject matter jurisdiction. To the extent that the Plaintiff's Complaint (Doc. # 20) might be construed as stating a Title VII retaliation claim, culminating in a constructive discharge, that claim is DISMISSED for lack of subject matter jurisdiction. The state-law claims contained in Counts I, II, and IV of the Plaintiff's Complaint (Doc. # 20) are DISMISSED, without prejudice to refiling in a state court of competent jurisdiction. The Defendants' Motion to Strike (Doc. # 93) is OVERRULED as moot.

---

**16.** In any event, nothing in Dr. Cherry's affidavit would alter the result in the present case. If the affidavit had contained information pertinent to the Court's analysis above, the Court would have afforded the Plaintiff an opportunity to submit a proper affidavit.

**17.** Hall's first averment states: "Attorney Schmaltz had told me that I needed to file a claim through the [OCRC] and obtain a 'right to sue' letter before filing suit." (Doc. # 88, Exh. 1, at ¶ 18). Her second averment states: "The representative of the Ohio Civil Rights office with whom we met told us that they would issue a 'right to sue' letter." (*Id.* at ¶ 20).

Judgment will be entered in favor of the Defendants and against the Plaintiff.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.