Leah BURNS, Plaintiff,

v.

**JACOR BROADCASTING CORP., Defendant.**

No. C–1–99–469.

United States District Court,
S.D. Ohio,
Western Division.

Jan. 19, 2001.

Douglas Michael Morehart, Bunke Henkel Haverkamp Smith & Riehl Co LPA, Martin McHenry, Havercamp Brinker Rebold & Riehl Co LPA, Cincinnati, OH, for Leah Burns, Plaintiff.

Gary Lee Greenberg, Denlinger, Rosenthal & Greenberg—1, Cincinnati, OH, Marcia Nelson Jackson, Akin Gump

Strauss Hauer & Field, Dallas, TX, for Jacor Broadcasting Corporation, Defendant.

## ORDER

SPIEGEL, Senior District Judge.

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment (doc. 36); Defendant's Response (doc. 41); Defendant's Motion for Summary Judgment (doc. 37); Defendant's Memorandum in Support of the Motion for Summary Judgment (doc. 38); Plaintiff's Response (doc. 44); Defendant's Reply (doc. 46); Defendant's Objections and Motion to Strike Plaintiff's Summary Judgment Evidence (doc. 47); Defendant's Notice of Additional Authority (doc. 49); Plaintiff's Memorandum in Opposition to Defendant's Objections (doc. 53); Defendant's Reply (doc. 54); and Plaintiff's Addendum (doc. 55).

In addition, the Court held a status conference in this matter on December 20, 2000 (*see* doc. 50).

## BACKGROUND

### A. *Introduction*

On June 22, 1999, Plaintiff Leah Burns originally filed a six-count Complaint against Defendant Jacor Broadcasting Corporation. The original Complaint asserts that Plaintiff is a former employee of Defendant Jacor Broadcasting Corporation (*Id.*). In addition, at all material times, Jacor has owned and operated radio stations in Hamilton County, Ohio (*Id.*).

In the original Complaint, Plaintiff Leah Burns alleges the following causes of action: (1) violation of the Fair Labor Standards Equal Pay Act (hereinafter, "EPA"), Title 29 U.S.C. §§ 206, *et seq.;* (2) violation of Ohio's wage discrimination laws, Ohio Rev.Code §§ 4111.17 and 4112.02(A)(2); (3) state law retaliation, Ohio Rev.Code §§ 4112.02(a) and 4112.99; (4) violation of state law public policy against discrimination and retaliatory employment practices

by employers against their employees; (5) violation of Ohio's sex discrimination statutes, Ohio Rev.Code §§ 4112.02(A) and 4112.99; and (6) violation of the state's public policy in regards to employers allowing their employees to sexually harass, discriminate, and terminate the employment of other employees because of their sex (doc. 1).

Shortly thereafter, Defendant Jacor filed its first Answer denying, in pertinent part, the allegations as asserted in Plaintiff Burns' original Complaint (doc. 4). On March 29, 2000, Plaintiff Burns filed her Amended Complaint alleging basically the same facts, but adding two new federal causes of action: (1) Count VII asserts a cause of action against Defendant for retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.,* and (2) Count VIII asserts a cause of action for sex discrimination against Defendant in violation of Title VII (doc. 15).

Defendant Jacor followed with its Amended Answer again denying, in pertinent part, the allegations asserted in the Amended Complaint (doc. 17). In its Amended Answer, Defendant asserts a total of 20 affirmative defenses to Plaintiff's claims (*Id.*).

As noted earlier, Defendant Jacor Broadcasting Corporation is a corporation doing business in Ohio, and Plaintiff Leah Burns is a citizen of the State of Ohio. This Court has jurisdiction of this action under Title 28 U.S.C. § 1331 because it arises under the EPA and Title VII. The Court has supplemental jurisdiction of the state law claims alleged herein under Title 28 U.S.C. § 1367.

The following facts are drawn from the pleadings and documentary evidence in this case (*see* docs 1, 4, 15, 17, 37 & 44).

### B. *Facts*

The Jacor Broadcasting Corporation owned and operated radio stations throughout the United States until it

merged with Clear Channel Communications, Inc., in or about April 1999 (hereinafter, collectively referred to as "Defendant" or "Jacor"). Leah Burns (hereinafter, "Plaintiff" or "Burns") began working for Clear Channel in or around 1988. Burns' first full-time job at Jacor actually consisted of two part-time jobs, one at WEBN–FM and one at WLW–AM.

Burns thereafter received a pay increase and moved to WLW–AM to work full-time as an Assistant Production Director. Burns held this position for two years, then was promoted and moved to another Jacor station as a Production Director. While serving as Production Director, Burns performed on a show segment called "Chick Talk," in which four women discussed various issues, including their sex lives and other "adult topics." Burns received glowing performance reviews from her supervisor, Bill Willis ("Willis"), who was then the Program Director of WLW. Beginning in about 1989, Burns also lent her voice to the Gary Burbank Show that was also broadcast on WLW–AM and hosted by a local radio personality named Gary Burbank ("Burbank").

In 1994, Burns began working full-time on WLW, and according to Defendant, Burns knew that Jacor had a written policy prohibiting sexual harassment that instructed employees to immediately report any incidents of harassment or wrongful treatment to her supervisor. Burns asserts that the same policy did not explicitly state that there would be no retaliation allowed against the person who reported the incident of sexual harassment to their supervisor. "Jacor's Policy Against Sexual Harassment," which Burns allegedly received, states, in pertinent part:

> If you feel that you are being harassed, or treated in ANY manner that does not allow all of us to benefit from the potential you have to offer, please speak up!

. . . A prompt and through investigation will take place.

(doc. 37).

### 1. "The Burbank Incident."

In the Spring of 1994, Burns began working full-time on the Gary Burbank Show replacing Kevin "Doc" Wolfe, Burbank's long-time sidekick. According to Plaintiff, Burns played an integral role on the Gary Burbank Show. For example, Burns interacted on air with Burbank and wrote and performed comedy bits and sketches. Burbank allegedly described Burns as his "heir apparent," and Burbank allegedly considered Burns to be a "tremendous talent."

According to Defendant, Burns provided some character voices, occasionally helped write and edit material, and controlled the traffic logs once the show became nationally syndicated. Burns also performed on the air and discussed a variety of topics, including those of a "sexual or adult nature," as well as volunteered to sing on parody songs that required her to use vulgar terms and/or profanity in comedy bits.

Sometime during this time period, Burns' professional and personal relationship with Burbank deteriorated. According to Plaintiff, Burbank had previously expressed a physical attraction to Burns and allegedly went so far as to refer publicly and privately to Burns' appearance in a demeaning and sexually degrading manner. For example, Burbank allegedly announced on the air to his listeners that, Burns had a "champagne ass." Burns allegedly asked Burbank to stop his "harassment" of her, but he allegedly refused to do so.

Burbank's treatment of Burns worsened to the point that, he allegedly physically lunged at her and threatened to strike her. Burns further alleges that Burbank broadened his abuse by calling her "the fat lady at the circus." Burns asserts that Burbank's mistreatment of her continued in this way from the Winter of 1994 until

Plaintiff left the show sometime in 1997. Burns contends that she went to their supervisor for help, but Willis offered her no assistance in stopping the ongoing "harassment" by Burbank.

Sometime in 1997, Laura Steele ("Steele"), who was then reading the news on WEBN–FM's morning drive-in show titled, "The Dawn Patrol," announced she was leaving Cincinnati. Burns soon began asking about transferring to WEBN's Dawn Patrol.

According to Plaintiff, in part to escape the abusive relationship with Burbank and in part to further advance her career, Burns contacted Jim Richards ("Richards"), Program Director at WEBN and Marc Chase ("Chase"), who at that time supervised Richards, Burns and Burbank, and informed Richards and Chase that she wanted to leave the Gary Burbank Show and transfer to WEBN, because Burbank was "a terror to work with." Eddie Fingers ("Eddie"), the star of the Dawn Patrol, also allegedly "initiated pursuing" Burns at about the same time to come to the Dawn Patrol, because of "her work on the [Gary] Burbank Show." Eddie was allegedly not then aware of Burns' concerns about Burbank's abuse that was directed at Burns.

Richards and Chase allegedly agreed she would move onto WEBN–FM, slowly at first, in order to get accustomed to the WEBN format. Thereafter, Plaintiff began splitting her time between the Gary Burbank Show and WEBN. According to Plaintiff, in the Summer of 1997, Richards and Chase, having heard Burns state her career goal, "lured" Burns to the Dawn Patrol by leading her to believe that she would perform the duties of a "co-host" or "co-star" on the Dawn Patrol. To further that goal, Burns believed that she would write and perform bits on the air and would eventually become the next Robin Wood. Ms. Wood had been a co-host of the Dawn Patrol for several years prior to Burns' transfer to WEBN–FM.

## 2. The First Formal Discrimination Complaint by Burns.

According to Defendant, in October of 1997, Burns met for the first time with Barb Buchwald ("Buchwald"), Jacor's head of Human Resources and allegedly first told Buchwald that, in 1994, Burbank had referred to Burns on and off the air as having a "champagne ass," that he lunged at her, and went on to describe other various instances of sexual harassment and intimidation she allegedly suffered at the hands of Burbank. Buchwald allegedly then told Burns that she had been sexually harassed by Burbank and that Jacor had a policy prohibiting sexual harassment.

Burns asserts that she never made a formal complaint of sexual harassment in the three years since the alleged abuse began, because Burns feared that she would be retaliated against if she made a formal complaint of sexual harassment under the policy and, because she felt that Jacor's upper management was not committed to ending sexual harassment. According to Plaintiff, Buchwald allegedly agreed with Burns and stated "that Jacor had a track record of not promoting women" and of not assigning women to significant on air positions.

After meeting with Burns, Buchwald met with Jacor management, including Senior Vice President of Programming for Ohio, Dave Crowl ("Crowl"), Market Manager, Mike Kenney ("Kenney"), Cincinnati Program Director and Senior Vice President of Programming, Marc Chase, and WEBN's General Manager, Alene Grevey ("Grevey"), in order to discuss the situation.

Buchwald went on to explain what she learned from Plaintiff and told the group that Burns did not want Buchwald to speak to Burbank about these issues. Burns only request was to be completely removed from the Burbank Show and transferred full-time to WEBN. The group determined that they needed additional information and decided to ask Burns wheth-

er she would be willing to meet privately with both Buchwald and Grevey for further discussions.

In response to Burns' complaint of sexual harassment, Grevey expressed concern about Burns completing her transition to the Dawn Patrol. Specifically, she felt that Burns might become uncomfortable on the Dawn Patrol in light of its "work product," which was largely "sexual or adult-oriented" in nature. According to Plaintiff, she assured Grevey and Buchwald at their private meeting that she would be able to distinguish on-air and off-air behavior, and she wanted to be a part of the Dawn patrol team as she, Chase, and Richards had already agreed to.

At this meeting and/or at a later meeting with Chase, Richards, Grevey and Buchwald, Burns was presented with four options that would succeed in completely removing her from the Gary Burbank Show.

One of the options would have given Burns her own show on another local radio station. Another option would have allowed Plaintiff to become the local personality for a syndicated show. Burns was also given two options to work on the Dawn Patrol. According to Defendant, Burns declined the other options presented, and, despite reminders that the Dawn Patrol was a show with sexual or adult-oriented content, she allegedly chose to become the Producer of the Dawn Patrol.

According to Plaintiff, Chase told those in attendance that Burns' job would allegedly consist of the following duties: (1) Burns would "co-host" the Dawn Patrol with Bob Berry ("Bob") and Eddie Fingers; (2) Burns would produce the Dawn Patrol Show; (3) Burns would put together the "Best of the Dawn Patrol" weekend show; and (4) Burns would also read the news headlines.

In response to Buchwald's suggestion that this was too much work for one person, Chase allegedly assured those at the meeting that Burns would be provided assistance if and when she asked for it. However, Burns alleges that she repeatedly expressed concern, before moving full time to the Dawn Patrol and that "she felt like the work load was too much for one person."

### 3. Burns's Request for an Employment Contract.

Burns started working on the Dawn Patrol full-time on November 29, 1997. As Producer, Burns took over the duties formerly held by Jimmy "the Weasel" Salzarulo ("Salzarulo") and some of the former news reading of Steele. Specifically, Burns booked guests and interacted on-air with the show's host and co-host, Eddie and Bob, respectively. She also put together the show's promotional materials and advertisements ("promos"), the Best of the Dawn Patrol Weekend Show, and read the news during the show's news breaks. Burns also did some writing for the show and performed character voices on the air along with Eddie and Bob.

According to Defendant, Eddie and Bob were dissatisfied with Burns' writing abilities and her overall performance. In or around December 1997, Burns inquired about entering into an employment contract specifying her duties, but Jacor declined to put her under contract. Defendant asserts that at no time did Jacor consider Burns to be a "co-host" or "co-star" of the Dawn Patrol show. For example, promotional materials, billboard advertising and other advertising allegedly depicted images of "Eddie and Bob" as the hosts of the Dawn Patrol—never Burns.

According to Plaintiff, Burns was promised, considered to be, and performed many of the duties of a "co-host," and that Jacor did offer contracts to many of its male on-air talents. Burns also alleges that she was paid substantially less than similarly-positioned male employees at Jacor. In addition, Burns contends that her "legitimate and foreseeable requests" for assistance were denied by Jacor, despite

Chase's earlier assurances of supplemental support.

Burns reports that she later told Buchwald that Burns feared that she was being punished for complaining about her co-worker's harassment and the refusal of Chase and Richards to do anything about it. Buchwald allegedly responded that Burns would either have to take it or find another job.

Nonetheless, according to Plaintiff, her superiors and co-workers praised her work and, her talents, recognized her as a valued contributor to the Dawn Patrol. Indeed, Eddie, Bob and Michael Walter ("Walter"), who at this time had replaced Richards in his position, consistently praised her performance. In fact, Eddie, "the captain of the Dawn Patrol," repeatedly complimented Burns about her ability to arrange guests, the bits that she wrote, and her on-air interactions with Eddie and Bob.

Furthermore, Eddie, who had allegedly expressed dissatisfaction with Bob's on-air interaction, encouraged Burns to interact more on the air to the exclusion of Bob. In fact, Eddie allegedly praised her on-air performance when she did. Moreover, Eddie allegedly insisted that Burns, not Bob, co-hosted the WEBN Fireworks Show during the Labor Day weekend of 1998, shortly before the budget meetings began.

### 4. "The Nixon Incident."

According to Plaintiff, in the Summer of 1998, Burns complained to Buchwald that she felt that her co-workers had engaged in an undescribed form of sexual harassment at a staff meeting. Buchwald allegedly passed Burns' complaint along to Grevey. Also, in the Summer of 1998, Burns complained to Buchwald about the heavy workload of her position. Buchwald allegedly directed Burns to address her complaints to Chase and Grevey. Burns specifically told Grevey that she thought that Jacor had allowed her to be overworked allegedly because of her sex.

In or about the Fall of 1998, Mojo Nixon ("Nixon"), a nationally known singer, comedic songwriter, and touring performer joined the Dawn Patrol. While on the air, Burns and Nixon sat next to each other. Shortly after Nixon joined the Dawn Patrol and immediately after an on-air session, Burns leaned over Nixon to unplug her headphones, which were plugged into an electrical socket located behind Nixon's seat. Nixon then allegedly simulated as if Burns were performing oral sex on him and Burns immediately "jumped up and said, . . . sexual harassment." Two or three days later, while in the newsroom with Eddie and Burns, Nixon allegedly suggested that Burns expose herself by removing her sweatshirt. Eddie allegedly considered this latest antic of Nixon to be "a tasteless joke" and could tell that Burns had been offended by it.

Eddie accompanied and verified Burns' version of the story as she reported her complaints about Nixon's comments to Walter, Program Director of WEBN and Scott Reinhart ("Reinhart"), WEBN's Operations Manager. Eddie and Burns allegedly described for Walter and Reinhart both the newsroom and studio incidents immediately after the latest incident of "sexual harassment."

When Walter learned of Nixon's comments, he allegedly informed Nixon that inappropriate remarks would not be tolerated, and that he needed to use better judgment in the future. On October 1, 1998, Walter prepared an inner-office memorandum that was signed by both Nixon and Burns acknowledging that Nixon would no longer make inappropriate statements, and everyone allegedly agreed that the matter was now resolved. According to Defendant, Burns later told Grevey, the General Manager, how pleased she was at the way this latest incident was handled.

### 5. Fall of 1998 Discrimination Complaints by Burns.

However, Burns was not pleased about several other aspects of her job. For ex-

ample, sometime in early Fall of 1998, Burns complained to Grevey and others of having too much work to do and of not being under contract. Specifically, Burns pointed out to Grevey that "women aren't getting contracts" and that she believed that she was being discriminated against because of her sex.

According to Defendants, Grevey explained to Burns that everyone at Jacor was being asked to take on more responsibility, and, during the time in question, contracts were simply not being offered to morning show producers. Burns also allegedly complained to Chase that she had to come in before Eddie and Bob, the stars of the show, and had to stay at work long after they had left for the day. Chase allegedly reminded Burns that she had already removed the afternoon news reading duties Burns was supposed to perform, and also allegedly reminded her that everyone at Jacor had to work better, faster, and cheaper.

According to Plaintiff, during the Fall of 1998, Buchwald allegedly concluded and informed management at Jacor that, Burns might file an EEOC charge against Jacor due to the fact that Jacor allegedly had grown intolerant of Burns' desire to work in an environment free of discrimination and sexual harassment.

### 6. Leah Burns's Position at Jacor is "Obsolete" in 1999.

On January 7, 1999, Burns was informed by Buchwald and Greevey that she would not be getting further assistance, but, in fact, she was being fired. Greevey and Chase allegedly explained that Burns was being fired because of a change in Jacor's computer system made her job "obsolete." This was allegedly the only reason given to Burns as to why she was being fired. In fact, Plaintiff asserts that, on January 7, 1999, Greevey and Chase specifically told Burns that she was not being fired due to unsatisfactory performance. Not surprising, Defendant offers a much different set of circumstances in regards to Burns employment "layoff."

According to Defendant, in late 1998, Jacor began installing the "Prophet" Computer System at each of its stations. The Prophet system allows employees to prerecord a radio show in less time than it would take to actually perform the show, because the radio performers do not have to sit and wait, for example, for a commercial or song to play. Those items can be inserted into the show later by the computer.

Thus, a four-hour show can be programmed in as little as thirty minutes and employees have additional time to perform other duties. In effect, the Prophet system allows three employees to perform the duties that it originally took four employees to perform. It also allows an employee to record shows for multiple markets from a single location, including variations for each market.

Furthermore, according to Defendant, in order to pay for the acquisition and installation of the Prophet system, Jacor's markets (groups of stations) were each instructed to make budget cuts averaging $40,000 per station. Scott Reinhart, WEBN–FM's new Operations Manager, whom Defendant alleges was completely unaware of the Burbank Incident, was assigned the preliminary task of evaluating two Cincinnati radio stations' budget (including WEBN), and determining where exactly could those two stations could afford to make budget cuts.

In reviewing the budgets, Reinhart determined that Burns was a good candidate for "layoff" primarily because Burns was earning $47,000 a year as a morning show producer, which allegedly is significantly more than other male and/or female morning show producers, who generally made between $10,000 and $25,000 annually, based on Reinhart's experience in the radio industry.

Reinhart also allegedly suggested that Prophet could allow overnight show host,

Rob Calvert ("Calvert") to prerecord at least a portion of his show and also perform as the Dawn Patrol Producer for a total of $20,000, or $27,000 less than what Burns was currently earning. Chase allegedly and independently reached the same conclusion as Reinhart in regards to the budget cuts.

Defendant concludes its account of the Burns' "layoff" by asserting that, Reinhart and Chase also allegedly agreed that a male WEBN employee, Chris Mertens, whose duties could also be distributed among existing employees due to Prophet, would be terminated as well. Chase allegedly made sure that before Burns was let go, Eddie, the co-host, "captain," and star of the Dawn Patrol would accept and agree to Burns' "layoff."

Eddie allegedly did not object to, and, in fact, agreed with the decision to let Burns go. Sometime after Burns was laid off, she was offered a position at a Jacor radio station in Baltimore, Maryland. The Baltimore station offered Burns a job at an annual salary of $54,000 ($7,000 more than she made in Cincinnati), agreed to pay her moving expenses and living accommodations for thirty days, and also offered Burns a one year contract. However, Burns declined the offer.

In relation to the facts and circumstances surrounding her alleged firing, Burns argues that Jacor had a far more sinister motive for getting rid of her. The budget meetings were held in the last quarter of 1998. In response to the meetings and according to Plaintiff, Crowl instructed Grevey to devise with Chase "a game plan" to eliminate "non-significant roles" and to consolidate positions.

Crowl allegedly did not instruct Grevey or Chase or anyone else for that matter that they were to reduce expenses at any radio station, including WEBN, by one cent, much less $40,000. There is no evidence that labor expenses in fact went down in 1999, as compared to 1998. Grevey allegedly had no idea whether such a reduction had occurred, neither did Chase.

Moreover, Crowl alleged instructions were not in writing, they were all oral.

Chase recommended to Grevey in the Fall of 1998 that Burns be terminated, and not laid off. Grevey accepted that recommendation. Chase allegedly received input and agreement from Walter, Reinhart and Eddie to terminate Burns. On January 7, 1999, only a short time after the Nixon Incident, Grevey and Chase informed Burns that she was being "fired."

According to Plaintiff, the only reason that Grevey and Chase gave for her firing was because of a change in Jacor's computer system made her job "obsolete." Burns was specifically told by Grevey and Chase that she was not being fired due to poor performance, but that, her "job was being made obsolete by the Profit computer system."

Plaintiff argues that Prophet did not make her job obsolete since one of her duties was actually eliminated. Each duty was allegedly performed by a man, Rob Calvert, who had never previously been a morning show producer, now became the Producer of the Dawn Patrol. In addition, Calvert also assumed Burns' duties of preparing the Best of the Dawn Patrol Weekend Show and assembling promos. Furthermore, Rick Bird assumed Burns' duty of reading the news and Walter assumed part of Burns' on-air presence. Furthermore, Nixon returned to the Dawn Patrol in 1999, shortly after Burns was fired, and assumed an on-air presence.

### C. *Procedural History*

### 1. Plaintiff's Motion is Granted–In–Part (doc. 36).

On August 1, 2000, Plaintiff filed a Motion for Partial Summary Judgment (doc. 36), followed shortly thereafter by Defendant's Response. In her Motion for Partial Summary Judgment, Plaintiff moves this Court to enter an Order specifying that the following facts and issues be deemed established:

1. Exhibit 1 attached hereto is a true and accurate copy of the Charge of Discrimination filed by Plaintiff with the Equal Employment Opportunity Commission (hereafter, "EEOC") (hereafter, "Plaintiff's Charge") on March 17, 1999.
2. Exhibit 4 attached hereto is a true and accurate copy of the Notice of Rights to Sue issued by the EEOC with respect to Plaintiff's Charge on or after January 5, 2000.
3. Plaintiff's action under Title VII of the Civil Rights Act of 1964, as amended, was filed no later than ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue issued by the EEOC.
4. All jurisdictional and procedural prerequisites to the maintenance of this action have been satisfied.

(*Id.*).

In its Response, Defendant stipulated to the first three issues presented in Plaintiff's Motion, but contended that, the fourth issued "be denied to the extent that plaintiff seeks the Court to declare that—[a]ll jurisdictional and procedural prerequisites to the maintenance of this action have been satisfied'" (doc. 41). Defendant characterized Plaintiff's fourth issue as being "overbroad, improper, and should be denied" (*Id.*). Plaintiff did not file a Reply memorandum to its Motion.

Having reviewed this matter and for good cause shown, this Court hereby GRANTS–IN–PART Plaintiffs' Motion for Partial Summary Judgment (doc. 36) in regards to the three issues stipulated to by Defendant in its Response (*see* doc. 41). However, this Court finds Defendants' concerns as to Plaintiff's fourth issue to be well-taken, and, therefore, we find that only those jurisdictional and procedural prerequisites for the Title VII claims explicitly contained in Plaintiff's EEOC charge have been satisfied.

### 2. Plaintiff's Voluntary Dismissal of Counts I & II.

In August of 2000, Defendant filed its Motion for Summary Judgment as to all eights counts listed in Plaintiffs' Amended Complaint (docs. 37 & 38). Shortly thereafter, Plaintiff filed her Response (doc. 44), followed by Defendant's Reply (doc. 46).

In her Response, Plaintiff states that, "[i]n the interest of judicial economy, and in order to focus this Court's attention on Plaintiff's strongest claims, Plaintiff shall not oppose Defendant's motion for summary judgment as directed to Counts I and II" (doc. 44).

Having reviewed this matter, the Court hereby DISMISSES Count I (the Equal Pay Act) WITH PREJUDICE, and DISMISSES Count II (the Ohio wage discrimination claim) WITHOUT PREJUDICE from the Amended Complaint (doc. 15) as requested by Plaintiff in her Response (doc. 44). In addition, Defendant filed a Notice of Additional Authority (doc. 49) which the Court shall consider in our deliberations.

On December 20, 2000, this Court held a status conference in this matter (doc. 50).

### 3. Defendant's Motion is Granted–In–Part (doc. 37).

The Court has federal question jurisdiction over the Title VII claims (i.e., Counts VII–VIII), as well as the various pendent state-law claims (i.e., Counts III–VI). We also have federal question jurisdiction over the Title VII claims pursuant to 28 U.S.C. § 1331. In addition, the Court may exercise its supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367, as these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

This matter is now ripe for this Court's determination.

Having reviewed this matter and for the following reasons, the Court hereby GRANTS–IN–PART Defendant's Motion for Summary Judgment (doc. 37)

## STANDARD OF REVIEW

The narrow question that we must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Id.* at 321, 106 S.Ct. 2548; *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir. 1992); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). If the moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see Guarino*, 980 F.2d at 405.

As the Supreme Court stated in *Celotex*, the non-moving party must "designate" specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Guarino*, 980 F.2d at 405. Although the burden might not require the non-moving party to "designate" facts by citing page numbers, " 'the designated portions must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies.' " *Guarino*, 980 F.2d at 405 (quoting *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990)).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir.1990).

## DISCUSSION

### A. *Introduction*

It is unlawful under federal law for any employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). Before addressing the merits of Burns' claims, the Court notes that Gary Burbank and Mojo Nixon may not be found personally liable under Title VII. *See Wathen v. General Elec. Co.*, 115 F.3d 400, 406 (6th Cir.1997) (concluding that "Congress did not intend for individuals to face liability" under Title VII). However, *respondeat superior* liability is incorporated within Title VII, so Jacor could be held liable under federal law. *Wathen*, 115 F.3d at 405.

It is well-established that the burden is on an employment discrimination plaintiff to establish a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). A Title VII plaintiff may establish a *prima facie* case of discrimination either by presenting direct evidence of intentional discrimination by the defendant, *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), or by showing the existence of circumstantial evidence which creates an inference of discrimination, *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. *See Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d

1241, 1246 (6th Cir.1995). In the case at bar, Plaintiff has not filed individual claims against Burbank or Nixon (*see* doc. 15).

Defendant Jacor Broadcasting Corporation has filed a Motion for Summary Judgment as to Plaintiff Burns' federal and state discrimination claims, Counts III–VIII, of Plaintiff's Amended Complaint (doc. 37). Plaintiff has alleged in her Amended Complaint that she was discriminated against and was terminated on January 7, 1999, in violation of Title VII of the Civil Rights Act of 1964 and in violation of the Ohio statutory laws and state public policy, for opposing what she believed in good faith to be sex discrimination, sexual harassment, and retaliation (doc. 15).

A plaintiff may establish a violation of Title VII, without having to prove a tangible employment action, by proving that sex-based discrimination created a hostile or abusive working environment. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Williams v. General Motors Corp.*, 187 F.3d 553, 560 (6th Cir.1999). The Court notes that Plaintiff did not assert a claim for hostile or abusive work environment in her Amended Complaint (*see* doc. 15).

### B. *Count VIII—Title VII: Plaintiffs' Disparate Treatment.*

#### 1. Elements of a Prima Facie Case.

■ In order to succeed in a Title VII action for disparate treatment employment discrimination based on sex, a plaintiff must demonstrate that the adverse employment decisions would not have been made "but for" her sex. *See Gutzwiller v. Fenik*, 860 F.2d 1317, 1328 (6th Cir.1988). A plaintiff can make this showing by presenting direct evidence, or by inference, from a *prima facie* showing of discrimination using the evidentiary framework set forth in the landmark cases of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Bur-*

*dine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See also, Black v. Columbus Public Schools*, 124 F.Supp.2d 550, 565 (S.D.Ohio 2000).

■ In order to establish a *prima facie* case of disparate treatment, a plaintiff must at a minimum show that she is a member of a protected class and she was treated differently than persons who are not members of a protected class. *See Hollins v. Atlantic Co.*, 188 F.3d 652, 658 (6th Cir.1999). Thus, in order to prove a *prima facie* case of disparate treatment under Title VII, this Plaintiff must prove that: (1) she is a member of a protected class; (2) she was qualified for the job; (3) an adverse employment action was taken against her; and (4) she was replaced by someone outside the protected class, or treated differently than similarly situated non-protected employees. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *see also Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 728 (6th Cir.1999); *Kirkland v. St. Elizabeth Hosp.*, 120 F.Supp.2d 660, 665–66 (N.D.Ohio 2000); *O'Hara v. Mt. Vernon Bd. of Educ.*, 16 F.Supp.2d 868, 886 n. 16 (S.D.Ohio 1998).

In order to prove the fourth element, a plaintiff must produce evidence that the "relevant other employees are 'similarly situated in all respects.'" *See Hollins*, 188 F.3d at 659 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir.1992)). Once the plaintiff establishes the *prima facie* case, the employer must meet its burden of production to establish a legitimate, nondiscriminatory reason for the plaintiff's discharge or denial of promotion. *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

The burden of production then shifts back to the plaintiff to show by a preponderance of the evidence that the employer's legitimate reasons are pretexts for discrimination. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. The plaintiff may establish a pretext by showing that the employer's proffered explanation

is false or unworthy of credence. *Reeves v. Sanderson Plumbing Prods., Inc.* 530 U.S. 133, 120 S.Ct. 2097, 2105–2106, 147 L.Ed.2d 105 (2000).

In other words, the plaintiff must prove "that the [employer's] asserted reasons have no basis in fact, that the reasons did not in fact motivate the discharge, or, if they were factors in the [employer's] decision, that they were jointly insufficient to motivate the discharge." *Burns v. City of Columbus*, 91 F.3d 836, 844 (6th Cir.1996) (citations omitted); *see also Laderach v. U–Haul of Northwestern Ohio*, 207 F.3d 825, 828 (6th Cir.2000).

The *McDonnell Douglas* burden-shifting analysis also applies to "failure to promote" discrimination claims. *See Brown v. State of Tennessee*, 693 F.2d 600, 603 (6th Cir.1982). The Court notes that Plaintiff did not assert a claim of failure to promote in the Amended Complaint.

In *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the Supreme Court held: "in saying that gender played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman." *Price Waterhouse*, 490 U.S. at 250, 109 S.Ct. 1775 (footnote omitted); *see also Laderach*, 207 F.3d at 829.

In its recent decision in *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660–66 (6th Cir.2000), the Sixth Circuit cautioned that the courts must not use the "qualified" element of the *prima facie* case in order to heighten the plaintiff's initial burden. In an effort to ensure that the first two stages of the *McDonnell Douglas* inquiry remain analytically distinct, and that a plaintiff's initial burden not be too onerous, *Cline* requires that the "qualified" prong of the *prima facie* case be evaluated in light of the plaintiff's employment record "prior to the onset of the events that the employer cites as its reason" for its decision. *Id.*, 206 F.3d at 662–63.

Moreover, the Sixth Circuit instructed that the legitimate, nondiscriminatory reason offered by the employer at the second stage of the *McDonnell Douglas* inquiry, may not be considered in determining whether the employee has produced sufficient evidence to establish a *prima facie* case. *Cline*, 206 F.3d at 660–61. Thus, assessing the plaintiff's qualifications by comparison to similarly-situated, non-protected, class employees is a matter reserved to the defendant's "legitimate nondiscriminatory reason rebuttal." *Id.*; *see also Hoffman v. Sebro Plastics*, 108 F.Supp.2d 757, 772 (E.D.Mich.2000).

### 2. Sex Discrimination When Plaintiff Was Terminated.

#### a. Plaintiff's Prima Facie Case.

In analyzing Plaintiff's claims, we look first to whether Plaintiff has produced enough evidence to make out a *prima facie* case of discrimination. This is not intended to be an onerous burden on the Plaintiff. *See Burdine*, 450 U.S. at 251, 101 S.Ct. 1089. As a preliminary matter, there is no genuine dispute that this Plaintiff meets the first three elements for presenting a *prima facie* case for sex discrimination under *McDonnell Douglas*. Plaintiff is a female. This puts her within the protected class for gender discrimination claims. Second, neither Party disputes the fact that Plaintiff was either fired or laid off on January 7, 1999. Finally, the Parties also do not dispute the fact that Plaintiff was qualified for her position as Producer of the Dawn Patrol.

This leaves the fourth element: whether Plaintiff was replaced by a person outside the class, or were similarly-situated individuals treated differently than Plaintiff was? *See Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992).

In her Response, Plaintiff asserts that there is more than sufficient evidence that sex was a determining factor in Defen-

dant's decision to terminate Plaintiff's employment (doc. 44). Specifically, Plaintiff alleges that, "Plaintiff, a woman, was terminated allegedly for poor performance; men, on the other hand, who exhibited poor performance, were retained and given other opportunities. Defendant contends now that Plaintiff's termination resulted from an economic cutback, yet it hired the high-priced Nixon, a male, to assume her on-air duties; the termination of Plaintiff allowed Defendant to give her on-air time to Nixon" (*Id.*).

### b. Plaintiff's Assertion of Pretext.

In addition, Plaintiff argues that she was replaced by an unqualified male, Calvert, in the very same job Plaintiff performed, as the Producer of the Dawn Patrol Show. Therefore, Plaintiff concludes that, Defendant's suggestion to the contrary and assertion that Plaintiff was actually replaced by Wendy Walker ("Walker"), a female who was hired on the Dawn Patrol long after Burns was terminated, is simply a pretext and false.

Rather, according to Plaintiff, Rick Bird ("Bird") assumed Plaintiff's news-reading duties upon her termination—Walker did not perform those duties until much later. Moreover, Plaintiff maintains that Defendant also hired Mojo Nixon, a male, to replace her. Specifically, Plaintiff asserts that Nixon's contract expired in December 1998, however, he signed another and was rehired in early 1999, in part to take over some of Burns' duties.

### 3. The Court's Holding.

■ Having reviewed this matter, the Court finds that there are no genuine issues of material fact which exists in regards to Plaintiff's termination. Specifically, the Court holds that Plaintiff's sex discrimination claim fails because she cannot prove a key element of her *prima facie* case, namely, that she was replaced by a male employee or, more importantly, that Plaintiff was treated differently than "simi-larly situated male employees." *See Hollins,* 188 F.3d at 658.

In addition, we find Defendant's arguments asserted in its Motion for Summary Judgment to be well-taken (doc. 37), and, conclude that Defendant is entitled to judgment as a matter of law on the issue of Plaintiff's termination for a number of reasons.

First, Plaintiff has failed to come forward with even one similarly-situated male employee who was offered a contract while she was not. To the contrary, 19–year Jacor veteran, male employee and a former sidekick to Gary Burbank, Kevin "Doc" Wolfe, never had a contract, nor did Rick Bird, who read the news on WEBN for approximately 21 years, nor did Jimmy Salzarulo have a contract when he performed as the Dawn Patrol Producer, the job Plaintiff held when she allegedly requested to enter into an employment contract in 1998.

■ Second, even if Plaintiff could somehow establish a *prima facie* case of sex discrimination, Plaintiff cannot prove that Jacor's legitimate, nondiscriminatory business-related reasons for not offering Plaintiff an employment contract were somehow pretextual or false. Defendant asserts that Plaintiff did not receive an employment contract because Jacor was not offering contracts to employees other than pure "on-air talent."

Plaintiff has produced no evidence to demonstrate either that this reason is "false" or that it is in reality a pretext for discrimination. Plaintiff does not dispute the fact that former female on-air talent and Dawn patrol co-host, Robin Wood, was under contract.

Moreover, strictly on-air talent Mojo Nixon was offered a contract and Jimmy Salzarulo transferred from the Dawn Patrol Producer position to on-air talent and show host—only then was he was offered a contract. Put simply, Plaintiff has failed to produce evidence of even a single male employee, who, like Plaintiff was primarily

a producer and secondarily an on-air presence, who was offered an employment contract.

Third, Plaintiff argues that this Court must deny Defendant's Motion for Summary Judgment, even if we find that Plaintiff's sex was not a determining factor in the decisions not to offer her an employment contract and/or to terminate her employment at Jacor, it was still one of the many reasons for her employer's decision. Nonetheless, we find that Plaintiff's claims still fail because she has not offered any documents, testimony, or evidence of any kind to show that her sex played any part in the decisions not to offer her a contract or to include Plaintiff as part of Jacor's 1999 budgetary cutback decisions. To the contrary, the evidence shows that Plaintiff was treated no different from a similarly-situated male counterpart.

Fourth, even if Jacor did tell Burns her position would become "obsolete" due to the Prophet computer system, that is essentially the same reason Defendant argues in its Motion—that Plaintiff's services would no longer be needed because it would be too costly to have her produce the Dawn Patrol now that Prophet allowed Calvert to produce the show and continue his duties at a fraction of Plaintiff's salary.

In other words, both the Plaintiff's and the Defendant's versions of the reason for her termination stand for the same proposition—due to the installation of the Prophet system, it was more cost-effective for Jacor to layoff or fire Plaintiff than to keep her employed. See Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 350 (6th Cir.1998) (holding that the district court properly found no inconsistency among various reasons given by the defendant for plaintiff's termination because they all revolve around a single idea: the plaintiff's position could no longer be justified as being cost-effective).

Furthermore, to the extent Plaintiff seeks to compare herself with similarly-situated male employees, her claim fails as a matter of law because she has not identi-fied one similarly situated male whom Jacor treated differently. Absent evidence that Defendant treated similarly-situated male employees differently, Burns cannot prevail. Therefore, given that the alleged discrimination was not "because of sex," Plaintiff cannot succeed on her gender-based disparate treatment claim as a matter of law. Hall v. Hebrank, 102 F.Supp.2d 844, 863 (S.D.Ohio 1999).

Even with the evidence and all reasonable inferences construed most strongly in her favor, Plaintiff simply has cited no evidence from which a trier of fact could conclude that Defendant discriminated her because of her gender.

### C. Count VII—Title VII: Workforce Reduction

#### 1. Elements of a Prima Facie Case.

All of these tests are also modified, somewhat, in the case of a work-force reduction. A company engages in a work-force reduction when business decisions cause it to eliminate the total number of positions. See Barnes v. GenCorp, Inc., 896 F.2d 1457, 1465 (6th Cir.1990). All of the relevant modifications for discriminatory discharge involve an analysis of the replacement for the discharged employee. See O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); Mitchell v. Toledo Hosp., 964 F.2d at 577.

"In the case of a true work-force reduction, there is no replacement to evaluate." Brown v. EG&G Mound Applied Technologies, Inc., 117 F.Supp.2d 671, 676 (S.D.Ohio 2000). A replacement employee is someone hired or reassigned to perform the plaintiff's duties. See Barnes, 896 F.2d at 1465. An employee is not replaced when another employee performs his duties in addition to his own. Id.

To make a prima facie sex discrimination claim in a reduction-in-force situation, the plaintiff must put forward sufficient facts showing that: (1) she was a

member of a protected class; (2) she was discharged; (3) she was qualified for the position; and in addition to the first three elements, (4) "additional, direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for impermissible reasons." *Barnes*, 896 F.2d at 1465 (applying a reduction-in-force situation to an age discrimination case); *see also Kirkland v. St. Elizabeth Hosp.*, 120 F.Supp.2d 660, 668 (N.D.Ohio 2000) (applying a reduction-in-force situation to a race discrimination claim); *Brown*, 117 F.Supp.2d at 677–78 (applying a reduction-in-force situation to a race discrimination claim).

Once a plaintiff has made a *prima facie* case, the burden switches to the defendant to articulate some legitimate, nondiscriminatory reason for the decision. *See McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas*, the burden of production may shift from the plaintiff to the defendant, but the burden of persuasion remains with the plaintiff throughout the analysis. *See Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1390 (6th Cir.1993). If the defendant meets this burden, then the presumption created from the *prima facie* case drops out and plaintiff has "an opportunity to prove ... that the proffered reasons were not the true reason for the employment decision, but were a pretext for discrimination." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also, St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citations omitted); *Brown*, 117 F.Supp.2d at 677.

## 2. *Discrimination When Plaintiff Was Laid Off.*

### a. Prima Facie Case.

In analyzing Plaintiff's claims, we look first to whether Plaintiff has produced enough evidence to make out a *prima facie* case of discrimination. This is not intend-ed to be an onerous burden on the Plaintiff. *See Burdine*, 450 U.S. at 251, 101 S.Ct. 1089. As a preliminary matter, there is no genuine dispute that this Plaintiff meets the first three elements for presenting a *prima facie* case for sex discrimination under *McDonnell Douglas*. Plaintiff is a female. This puts her within the protected class for gender discrimination claims. Second, neither Party disputes the fact that Plaintiff was either fired or laid off on January 7, 1999. Finally, the Parties also do not dispute the fact that Plaintiff was qualified for her position as the Producer of the Dawn Patrol.

This leaves the fourth element: whether Plaintiff has provided additional, direct, circumstantial, or statistical evidence of discrimination? *See Barnes*, 896 F.2d at 1465.

The Sixth Circuit has further articulated a plaintiff's burden of proving a *prima facie* case in a work-force reduction situation:

A work-force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not replaced as part of a work-force reduction when another employee is assigned to perform the plaintiff's duties in addition to her own duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

*Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990). In the case at bar, the Court finds that Plaintiff's position was not eliminated, but, rather, her assigned duties as producer were distributed among other retained employees at Jacor.

### 3. The Court's Holding.

■ Having reviewed this matter, this Court finds that there are no genuine issues of material fact which exists in regards to Plaintiff's layoff. Specifically, we

hold that Plaintiff's sex discrimination claim fails because she cannot prove a key element of her *prima facie* case, namely, that Plaintiff must present "additional, direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Barnes*, 896 F.2d at 1465.

In addition, we find Defendant's arguments asserted in its Motion for Summary Judgment to be well-taken (*see* doc. 37), and, conclude that Defendant is entitled to judgment as a matter of law on the issue of Plaintiff's layoff for a number of reasons.

First, Plaintiff has failed to come forward with the name of a single male employee, who, like her, performed duties that could not easily be transferred to existing employees, who was not laid off in January 1999. Again, the undisputed facts show that at least one such male employee, Chris Mertens, was laid off from Jacor during the same reduction-in-force for the very same reasons—budgetary cutbacks as a result of the installation of Prophet.

Second, even if Plaintiff could somehow establish a *prima facie* case of sex discrimination, Plaintiff cannot prove that Jacor's legitimate, nondiscriminatory business-related reasons for Plaintiff's ultimate layoff were somehow pretextual or false.

Specifically, Plaintiff has failed to present evidence to show that Jacor's legitimate decision to lay Plaintiff off as part of the Prophet-related budget cuts is either "false" or a pretext for discrimination. Furthermore, WEBN could absorb Plaintiff's duties and her high salary by consolidating her job duties with lesser paid male and female employees.

Third, Plaintiff asserts that she was told that she was being laid off, not due to poor performance or dissatisfaction, but because the Prophet system made her job "obsolete," when in fact, Plaintiff claims that her job duties were eventually divided between male and female employees.

As explained in Defendant's Motion, even if Plaintiff's version of the facts were true, this is essentially the same reason Jacor maintains it gave Plaintiff for her layoff: that due to the installation of Prophet, it was more cost-effective to lay Plaintiff off than keep her employed. Sixth Circuit case law is clear that where a plaintiff is given slightly different explanations for her termination that all revolve around the same idea, there is no "falsity" sufficient to overcome a motion for summary judgment. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir.1998).

Fourth, Plaintiff's additional attempts to prove "falsity" are equally unavailing. For example, Plaintiff alleges that Rob Calvert was not "freed up" from his other duties, allowing him to add on the Dawn Patrol Show production duties. While it is true that Calvert continued to perform his pre-existing shift, he can now do so in significantly less time by pre-recording much of the show by using the Prophet computer system. Defendant could reasonably assume that this extra time created by Prophet could allow Calvert to take on Plaintiff's former production duties on the Dawn Patrol.

Fifth, the undisputed evidence supports Defendants version of the facts concerning Plaintiff's lay off, as stated, in pertinent part, in Defendant's Reply:

> In addition, at a time when budgets were being cut and employees throughout Jacor were being asked to take on additional responsibilities, Plaintiff consistently told Chase she was interested in doing less, not more. At the same time, Rob Calvert, then the overnight show host who was earning $27,000 less than Plaintiff, was consistently asking to take on additional duties. As Chase testified, '[W]e were in a position where we didn't need to have an overnight person and a morning show producer. I had a $20,000 employee that was willing to do more, I had a $50,000 employee that was asking me to do less. It was a very

easy, clear-cut business decision.' The reason for Plaintiff's layoff is, and always has been, the Prophet-related budget cuts and related consolidation of duties and reduction-in-force. There was no 'about face' on Jacor's part as to the reasons for her discharge and Plaintiff knows it.

(doc. 46).

We conclude that Plaintiff has failed to satisfy the fourth element of her sex discrimination claim in regards to additional, direct, circumstantial, or statistical evidence tending to indicate that Jacor singled out this Plaintiff for impermissible reasons. Alternatively, Plaintiff has failed to offer sufficient evidence of falsity or pretext in regards to Defendant's legitimate, non-discriminatory reason for her layoff.

### D. Count VII—Title VII: Retaliatory Discharge

#### 1. Elements of a Prima Facie Case.

Title VII prohibits an employer from discriminating against any employee "because he has opposed any practice made an unlawful practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a).

In addition to her Title VII claims of sex discrimination, Plaintiff also alleges that Defendant unlawfully retaliated against her for her complaints regarding the treatment of women at Jacor, for complaining about the incidents of sexual harassment at the hands of two of Jacor's on-air stars, the Burbank Incident and the Nixon Incident, as well as for requesting that Plaintiff be given a contract and a reasonable workload, as was given the male employees at Jacor.

■ To recover for retaliatory discharge, a plaintiff must show that: "(1) she engaged in an activity protected by Title VII; (2) this exercise of her protected civil rights was known to defendant; (3) defen-

dant thereafter took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Canitia v. Yellow Freight System, Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990) (citing *Wrenn v. Gould,* 808 F.2d 493, 501 (6th Cir.1987)); *see also Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982). All four elements must be established in order to make out a *prima facie* case. *Fenton v. HiSAN, Inc.,* 174 F.3d 827, 831–32 (6th Cir.1999).

The *McDonnell Douglas* and *Burdine* burden-shifting paradigms applicable in disparate treatment discrimination and reduction-in-force cases, are also applicable to retaliation claims as well. *See Zanders v. National R.R. Passenger Corp.,* 898 F.2d 1127, 1134–35 (6th Cir.1990) (find that in order to establish a causal connection, the plaintiff is required to "proffer evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action'"); *see also Hoffman v. Sebro Plastics, Inc.,* 108 F.Supp.2d 757, 776 (E.D.Mich.2000).

■ Plaintiff's success on her retaliation claim does not depend on the merits of the underlying discrimination claim. *See Powell v. Morris,* 37 F.Supp.2d 1011, 1016 (S.D.Ohio 1999); *Spence v. Local 1250, UAW,* 595 F.Supp. 6, 10 (N.D.Ohio 1984) ("An employee need not establish the validity of his original discrimination claim in order to prove a charge of employer retaliation flowing from the original claim ... the factual truth of the employee's accusation which inspired the reprisal is immaterial ... [w]hat is relevant is that the employee sincerely believed discriminatory practices existed. . . ."). "Thus, the employee need not establish that the alleged conduct she opposed was in fact discriminatory, so long as she can demonstrate that she had a good faith, reasonable belief that the conduct about which she complained was in violation of Title

VII." *Black v. Columbus Public Schools,* 124 F.Supp.2d 550, 570–71 (S.D.Ohio 2000).

## 2. Plaintiff's Prima Facie Case.

Plaintiff must first establish that she was engaged in activity protected by Title VII. The Court finds that a jury could reasonably conclude that Plaintiff had a good faith belief that the conduct and practices of which she complained of were a form of sex discrimination or sexual harassment.

Specifically, the Court notes the following instances: (1) the Burbank Incident; (2) the Nixon Incident; (3) Plaintiff's complaints that the male employees of Jacor had less duties and workload than Plaintiff; (4) Plaintiff's complaint that the male "on-air" employees of Jacor were rewarded with employment contracts, while Plaintiff was not; (5) Plaintiff's belief that Jacor gave male employees significant "on-air" positions, while Plaintiff was not given such opportunities.

For purposes of Title VII retaliation claims, these formal and informal complaints constitute protected activity. *See Weaver v. Ohio State Univ.,* 71 F.Supp.2d 789, 793 (S.D.Ohio 1998) (finding that plaintiff's informal complaints to employer concerning practices, which were prohibited by Title VII, was sufficient to constitute protected activity); *see also Black v. Columbus Public Schools,* 124 F.Supp.2d 550, 570–71 (S.D.Ohio 2000).

Although some of Plaintiff's complaints may have focused on what she perceived to be unfair treatment, many of her complaints also addressed what she perceived to be instances of sexual harassment and/or discrimination. In the context of summary judgment, all facts are viewed in the light most favorable to the non-moving party. Therefore, the Court will assume that Plaintiff's formal, as well as her informal complaints, qualify as protected activity, as they at least in part addressed what Plaintiff believed to be conduct prohibited by Title VII.

Plaintiff must also establish that the protected activity was known to Defendant. In its Reply, Defendant does not even attempt to deny that at least some of its managers, human resource's personnel, or other personnel in a supervisory position knew of at least one of the, if not all of, Plaintiff's complaints of sexual harassment, sexual discrimination, and disparate treatment. Therefore, Plaintiff has also met the second element.

Next, Plaintiff must demonstrate that Defendant took a materially adverse employment action against her. As discussed earlier, Plaintiff was fired because either her job was considered by Defendant to be "obsolete," or the Prophet computer system gave Defendant the opportunity and affordability to lay off Plaintiff and have her duties assigned to other employees. Defendant does not contest this element as well. Thus, Plaintiff has satisfied the third element of her retaliation claim as well.

Finally, in order to establish a *prima facie* case of retaliation, Plaintiff must also establish a causal connection between her protected activity and the adverse employment action. In other words, to establish the causal connection required in the fourth prong, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir.2000) (citing *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir.1997); *Jackson v. RKO Bottlers,* 743 F.2d 370, 377 (6th Cir.1984)).

This can be accomplished in two ways. "Plaintiff can offer direct evidence, or retaliation can be imputed if, in addition to the other evidence, Plaintiff shows a temporal proximity between the protected activity and the retaliatory act." *Black,* at 571–72; *see also Parnell v. West,* 114 F.3d 1188, No. 95-2131, 1997 WL 271751, at *2 (6th Cir. May 21, 1997) (unpublished disposition) ("A causal link can be shown by either of two methods: (1) through direct

evidence; or (2) through knowledge coupled with a closeness in time that creates an inference of causation.... However, temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence."); *see also Moore v. KUKA Welding Systems,* 171 F.3d 1073, 1080 (6th Cir. 1999) (holding that the close proximity in time between the adverse action and the protected activity coupled with the evidence of frequent discipline for trivial matters and unwarranted criticism of the plaintiff's work, when viewed as a whole, supported the jury's finding of retaliation); *Moon v. Transport Drivers, Inc.,* 836 F.2d 226, 229 (6th Cir.1987); *Cooper v. City of North Olmsted,* 795 F.2d 1265, 1272 (6th Cir.1986) (rejecting the proposition that temporal proximity is enough, noting that the plaintiff had pointed to no additional evidence to support a finding that the protected activity and the adverse action were connected); *Griswold v. Fresenius U.S.A., Inc.,* 978 F.Supp. 718, 733 (N.D.Ohio 1997); *Brown v. ASD Computing Center,* 519 F.Supp. 1096, 1116 (S.D.Ohio 1981).

"Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Nguyen,* 229 F.3d at 563 (citing *Moon v. Transport Drivers, Inc.,* 836 F.2d 226, 230 (6th Cir. 1987)). "The burden of establishing a *prima facie* case in a retaliation action is not onerous, but is one easily met." *Id.* at 563 (citing *Avery,* 104 F.3d at 861).

### 3. Plaintiff's Assertion of a Causal Connection.

Plaintiff complained to management about the Nixon Incident in late Fall 1998, and her employment with Jacor was subsequently terminated on January 7, 1999. Although Plaintiff does not totally rely on the temporal proximity theory, Defendant does argue against it. Defendant correctly argues that a retaliation claim cannot survive merely on proof of a temporal connection which shows the adverse employment action occurred at some point after the protected activity.

In this case, Plaintiff offers several instances in which she alleges that a reasonable jury could conclude from temporal proximity alone that there was a causal connection between Plaintiff's internal complaints about the Fall 1998 Nixon Incident and the January 1999 decision to terminate her. First, according to Plaintiff, the discussions of the budget, the installation of the Prophet computer system and her being marked for termination, occurred in the last quarter of 1998, which began on October 1, 1998.

Second, in the Summer of 1998, Plaintiff complained of what she perceived to be a discriminatory workload and of women not getting contracts. Third, in late September 1998, Plaintiff complained to management and human resources about Nixon's "oral sex" simulation and request that she "remove her top." These incidents were memorialized in writing by Jacor's senior management on October 1, 1998, the first day of the last quarter.

Fourth, Chase testified that a factor in his decision to identify Plaintiff for termination was her complaints about the excessive workload. Plaintiff argues that, "[i]t was precisely this excessive workload that Plaintiff had complained of as being discriminatory to Grevey, who was Chase's boss, and who approved his recommendation to terminate Plaintiff." Fifth, Plaintiff was actually terminated from employment with Jacor on January 7, 1999.

Plaintiff concludes her response with several points as to why she believes there is a causal connection between her good faith complaints of discriminatory conduct on the part of Jacor and her termination a short time thereafter:

> To deprive Plaintiff of the reasonable inference of causal connection arising from proximity alone is to ignore the

evidence of the nature of Defendant's reaction to Plaintiff's complaints of sexual harassment, first by Burbank, then by Nixon. The evidence shows that Defendant viewed Plaintiff's complaints with suspicion. To this day, Grevey and Chase dismiss them as snidely as "newly-discovered sensibilities." Walter and Fingers viewed Plaintiff's complaints about Nixon as more of the same: To them, Plaintiff had overreacted to Nixon's conduct. Each of these four (4) people contributed to the decision to terminate Plaintiff. Their perception of Plaintiff as an overly-sensitive female makes more likely (not less likely) that they were inclined to respond to Plaintiff's most recent complaints unfavorably when deciding whether she was to stay or go.

(doc. 44).

### 4. The Court's Holding.

Having reviewed this matter, this Court finds that there are no genuine issues of material fact which exists in regards to Plaintiff's termination. Specifically, we hold that Plaintiff's retaliation claim fails because she cannot prove a key element of her *prima facie* case, namely, that there existed a causal connection between the protected activity and the adverse employment action or harassment. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir.2000) (citing *Canitia*, 903 F.2d at 1066) (outlining previous standard for *prima facie* retaliation claim).

In addition, we find Defendant's arguments asserted in its Motion for Summary Judgment to be well-taken (doc. 37), and, conclude that Defendant is entitled to judgment as a matter of law on the issue of Plaintiff's retaliation claim for a number of reasons.

First, Eddie Fingers, who accompanied and verified Plaintiff's version of the Nixon Incident to Jacor's senior management, could have stopped Plaintiff's layoff, but failed to do so, and in fact, agreed that her duties could be easily performed by others. Second, Chase testified that Plaintiff was identified for the layoff because of her large salary, the introduction of the Prophet computer system, the fact that other employees could assume her duties at their same salary, a similarly-situated male employee, Chris Mertens, was also laid off, and because Plaintiff was asking to do less work, while a lower paid employee, Rob Calvert, was asking to do more.

The Court finds Defendant's rationale to be legitimate, nondiscriminatory, non-temporally related factors that articulate why Plaintiff was targeted for layoffs, and, in the alternative, Plaintiff has not shown to be pretextual or false.

Moreover, as with her discrimination claim, Plaintiff must show that it was her protected activities, and not her high salary, that was the determining factor in her layoff. *Hines v. The Ohio State Univ.*, 3 F.Supp.2d 859, 875 (S.D.Ohio 1998) (finding that "a plaintiff must demonstrate that a genuine issue of material fact exists with respect to whether plaintiff's participation in the protected activity was a 'but for' cause of adverse action").

Here, Plaintiff has failed to offer any evidence beyond her own speculation and conclusions to demonstrate that her protected activities played any part in her discharge. Thus, Plaintiff's retaliation claim fails.

Fourth, we find that the fact of temporal proximity alone is not particularly compelling in this case, because Plaintiff's retaliation case is otherwise weak and insufficient, and, furthermore, we find that there is substantial evidence supporting Defendant's version of events. *See Nguyen*, 229 F.3d at 566. "More importantly, however, while there may be circumstances where evidence of temporal proximity alone would be sufficient to support that inference, we do not hesitate to say that they have not been presented in this case." *Id.* at 566.

Finally, the Court takes note of the fact that Plaintiff has offered no explanation in her Response, was to why, if it was Jacor's intention to discriminate and/or retaliate against her, would Jacor offer Plaintiff a higher paying job, with an employment contract for a definite period of employment, and offer to pay her relocation expenses to a Jacor position located in Maryland after her layoff.

The Court considers this to be further evidence that Jacor terminated Plaintiff's employment at WEBN and the Dawn Patrol for legitimate, non-discriminatory motives, and when a suitable position came available in another locale that may have met Plaintiff's employment needs and Jacor's budgetary concerns, Defendant offered Plaintiff that position, which ultimately was not acceptable to Plaintiff.

### E. *Counts III–VI—Ohio State Law: Sex Discrimination.*

Plaintiff has included in her Complaint four pendent Ohio law causes of action, specifically Counts III–VI of the Amended Complaint (doc. 15).

Having already concluded that, Plaintiff's federal claims are without merit, this Court DECLINES to exercise supplemental jurisdiction over Plaintiff's state law claims. Therefore, the Court hereby DISMISSES WITHOUT PREJUDICE Counts III–VI of the Amended Complaint (doc. 1).

### F. *The Court's Summary.*

To survive a motion for summary judgment, Plaintiff must provide enough evidence on which a reasonable jury could find for her. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. A reviewing court must view the evidence in a light that is most favorable to the non-moving party. *See Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548.

Having reviewed the affidavits, deposition testimony, briefs, exhibits and all other materials furnished in support and in opposition to Defendant's Motion for Summary Judgment (doc. 37), the Court hereby DECLARES that there are no genuine issues of material facts as to the federal claims set forth above, and, Defendant is entitled to judgment as a matter of law.

Even assuming *arguendo* that Plaintiff could establish her *prima facie* case of discrimination, Defendant Jacor has offered several legitimate, nondiscriminatory reasons for its decision to terminate or lay off Plaintiff's position, and Plaintiff has not sufficiently shown that Jacor's stated reasons were either false or pretextual or that the real reasons were discriminatory.

Thus, Defendant is entitled to summary judgment as a matter of law (doc. 37). This Court hereby GRANTS Defendant's Motion for Summary Judgment as to Counts VII and VIII of the Amended Complaint in regards to Plaintiff's federal causes of action only (*see* doc. 15).

Having disposed of Plaintiff's federal claims, the Court DECLINES to exercise supplemental jurisdiction over the various state-law claims found in Counts III–VI of her Amended Complaint (doc. 15). "It is well settled that a District Court may decline to exercise supplemental jurisdiction over state claims once it has dismissed all claims over which it possessed original jurisdiction." *Hall v. Hebrank,* 102 F.Supp.2d 844, 865 (S.D.Ohio 1999) (citing *Saglioccolo v. Eagle Ins. Co.,* 112 F.3d 226, 233 (6th Cir.1997)). Indeed, the Sixth Circuit has recognized that if all federal claims are dismissed before trial, remaining state claims generally should be dismissed. *Saglioccolo,* 112 F.3d at 233.

Finally, also pending before the Court is Defendant's Objections and Motion to Strike Plaintiff's Summary Judgment Evidence in relation to the Affidavit Plaintiff Leah Burns filed with her Response (doc. 47). In Response, Plaintiff filed a Memorandum in Opposition (doc. 53), followed by Defendant's Reply (doc. 54).

Having reviewed this matter and given the Court's determination that Defendants

 

are entitled to summary judgment on Plaintiff's Title VII claims, we, therefore, conclude that Defendant's Objections are OVERRULED, and, in the alternative, are found to be MOOT at this time (doc. 47).

## CONCLUSION

For the reasons set forth above, the Court holds that: (1) Plaintiff's Motion for Partial Summary Judgment is GRANTED–IN–PART in that this Court DECLARES that only the jurisdictional and procedural prerequisites for the Title VII claims explicitly contained in Plaintiff's EEOC Complaint have been satisfied (doc. 36); (2) Plaintiff's requests to VOLUNTARILY DISMISS Counts I & II of the Amended Complaint is hereby GRANTED (doc. 44); (3) Defendant's Motion for Summary Judgment is hereby GRANTED–IN–PART in regards to Counts VII and VIII of the Amended Complaint; (4) COUNTS III–VI of the Amended Complaint are hereby DISMISSED WITHOUT PREJUDICE (doc. 15); and (5) Defendant's Motion to Strike the Affidavit of Plaintiff Leah Burns (doc. 47) is hereby Denied, or, in the alternative, found to be MOOT at this time.

Accordingly, the Court DIRECTS the Clerk of this Court to enter Judgment in favor of Defendant and against Plaintiff, and to TERMINATE this action from the Court's active docket.

SO ORDERED.